# CHARLESTON.

W. E. DEEGANS COAL Co. *et al. v.* G. C. HEDRICK

Submitted May 9, 1922.   Decided May 6, 1922.

1. CONTRACTS—*Defrauded Party Must Rescind at Once on Discovering Fraud, or as Soon Thereafter as Possible.*

Where a party has a right to rescind a contract on the ground of fraud, he must rescind at once on discovering the fraud or as soon thereafter as the circumstances will permit; and any unreasonable delay without good excuse therefor, will be regarded as a waiver of his right to rescind. (p. 383).

2.   CORPORATIONS—*Purchaser of Controlling Stock in Mine Cannot Rescind for Seller's Fraud, Where Continuing Operating After Discovering Fraud.*

Where one purchases the controlling stock of a coal company, takes charge of the coal mining plant, and shortly thereafter discovers that the seller has perpetrated a fraud upon him by false representations as to the character of the property if he wishes to rescind the contract of purchase he must do so promptly; and if he continues to operate the coal mine, after discovery of the fraud, until all the mineable coal is worked out, and then pulls the mine props and pillars, takes up the mine tracks, disposes of the miners' houses, mine motor, cars, mine rails, tipple and other mine equipment, putting it out of his power to put the seller in *statu quo*, he will not thereafter be permitted to rescind the contract. (p. 383).

3.   BROKERS—*Agent Authorized to Purchase at Given Price Must Account for Difference, Where Purchasing for Less.*

The first duty of an agent is to be loyal to his principal; and if he is authorized to purchase property at a given price and he finds that he can purchase it at less than the given price it is his duty to purchase at the lower price, and if he purchases at the lower price the amount saved by his purchase belongs to his principal, not to the agent, and he can be made to account therefor. (p. 385).

4.   SAME—*Agent Authorized to Buy Stock at Given Price, Settling With Principal at Such Price, Although Buying for Less, is Not Entitled Either to the Difference or to Commission.*

Where an agent is authorized to buy stock at a given price and his commission is fixed at an agreed sum, and the agent buys the stock at less than the given price, and settles with his principal at the given price, and receives payment of his fixed commission, without making a full and fair disclosure of the price paid for the stock, he is not entitled either to keep as profits the difference between the given price and the price paid or the commissions received by him. (p. 385).

Appeal from Circuit Court, Raleigh County.

Suit by the W. E. Deegans Coal Company and another against G. C. Hedrick. From a decree denying plaintiffs any relief, they appeal.

*Reversed and remanded.*

*Osenton & Lee, J. W. Maxwell* and *W. H. File,* for appellants.

. *A. A. Lilly, J. Lewis Bumgardner, C. M. Ward* and *Ashton File,* for appellee.

MEREDITH, JUDGE:

This suit was brought by plaintiffs for the cancellation of a sale of 405 shares of the capital stock of Beckley Vein Coal Company alleged to have been fraudulently made by defendant to plaintiffs, for the recovery of the sum of $60,750 paid therefor and the further sum of $1,000 alleged to have been paid him as commissions for his services in procuring stock for plaintiffs, and in the event that rescission of the sale cannot be had, plaintiffs seek to recover from defendant the profits which they aver he fraudulently made out of the transaction. The circuit court denied plaintiffs any relief and they appealed.

It would be impossible in the proper bounds of an opinion to make even a condensed statement of the 800 pages of oral testimony; but fortunately the negotiations of the parties upon which the transaction was based are evidenced by letters and these speak for themselves. A brief statement of the situation with excerpts from the letters will suffice.

Plaintiff, W. E. Deegans, resided at Huntington and was engaged in the coal business; he was president of his co-plaintiff, W. E. Deegans Coal Company, and was largely interested in a number of other coal companies. Defendant resided in Beckley, was cashier of the Raleigh County Bank, president, director and stockholder of the Beckley Vein Coal Company. That corporation was organized in October, 1917, and at the time of the transaction involved in this cause had an outstanding capital stock of $75,000. It owned a coal mining leasehold covering 658 acres of coal lands located some eight miles from Beckley in Raleigh County. It was connected to the railroad by means of a switch or branch which appears to have been constructed by the coal company. It had driven its main entry about 340 feet and its air course almost the same distance; a concrete foundation had been made for its tipple, timber and lumber acquired for its construction and probably partly in place; a mine motor had been purchased and was on the siding; it had acquired some

other personal property, and some miners' houses had been constructed, but the company was not prepared to ship coal in any great quantities because of the unfinished condition of its mine. It was mining from the Beckley vein, though it appeared there was possibly another vein on the property.

Hedrick and Deegans each held some stock in the Viacova Smokeless Fuel Company, which had an operation in the neighborhood of the Beckley Vein Coal Company. The parties had evidently been negotiating for some time when on January 10, 1918, Hedrick wrote Deegans, saying among other things: "I would like to go in with you on the organization to buy out the Viacova Smokeless Fuel Company, and the Beckley Vein Coal Company located at Sullivan. I think that both of these are good property we might work in a little bonus stock at some point." On January 30, Deegans wrote Hedrick: "I have been trying to get you over the 'phone since Monday and it seems impossible. Please advise if you will sell me 55 per cent of Beckley Vein. The reason I would rather have this than Viacova is there is not as much improvement, then every coal man has his idea about opening up a coal operation. You can call me over the 'phone if you like." To this Hedrick replied on February 1:

> "In response to your letter of the 30th concerning the purchase of fifty-five per cent of the Beckley Vein stock, will say that I was offered a month or more ago practically two for one for the control of this company, but I would not sell the folks wanting the control at any price, since I felt it would be an unpardonable offense to the remainder of the stockholders.
>
> "I would consider selling you the control of this company's stock because I believe you would give everybody a square deal.
>
> "The money expended at the Beckley Vein Coal Company has given good value and of course the remainder of the capital is in the treasury for use. Now I do not really control this company, but believe I can buy you the percentage of the capital stock at about $160 per share. Personally I would not take this for my stock, however, I can buy others for a less price, and I believe the price could be equalized at that point.
>
> "I do not think that it would be possible to option this stock, but should you decide to buy the stock will be glad to make an effort to purchase it with this

average figure and should I fail there will be no responsibility to you.

"I really believe that this is an excellent proposition. Also there is a seam underneath the one we are developing, which the Beard Coal Company is now developing one-half mile from this property on the same side of the creek, which *seem* shows a thickness of four and one-half feet. We have the refusal of this seam also.

"I have been trying to get you over the 'phone to discuss this matter with you, but have been unable to do so up to this writing."

On February 2, Deegans wrote to Hedrick: "I have the following proposition to make to you, and if you can put the deal over I will give you $500 for your trouble. I will give you $60,000 for $40,000 of Beckley Vein Coal Company's stock, provided the capital stock is $75,000. I will pay you cash $25,000, $10,000 in four months, $13,000 in eight months, and give you eighty shares of Viacova Smokeless Fuel Company." It appears that this letter was not received by Hedrick; there was some telephonic communication between the parties and Hedrick informed Deegans that he had not received the letter last quoted, and on February 15, Deegans wrote Hedrick as follows:

"A few days ago I wrote you a letter making you the following proposition: that I would give you One Hundred and Fifty ($150.00) Dollars per share for fifty-one (51) to Sixty (60) per cent of the Beckley Vein Company, and would pay you One Thousand ($1,000.00) Dollars for your trouble in securing same. As per our conversation over 'phone this morning, you failed to receive the letter, therefore, this letter will take the place of the former letter, and is about the same as well as I remember. If you can put in the Viacova Stock, do so, if not, it will be all O. K."

After the receipt of the letter of February 15, Hedrick proceeded to option or buy up at least 51 per cent of the capital stock of the Beckley Vein Coal Company, which he succeeded in doing between that date and February 22, the date the deal was closed. Deegans went to Beckley on February 21, and remained there until the next day, the deal being closed about 8:30 on the morning of the 22nd. At that time Hedrick delivered to Deegans 405 shares of the capital stock of the

Beckley Vein Coal Company; this stock at the stipulated price of $150 per share amounted to $60,750. Hedrick was to receive $1,000 for his services in procuring it, so the total cost of the stock to Deegans was $61,750; of this amount $31,375 was paid in cash; for the balance of $30,375, the W. E. Deegans Coal Company executed its two notes, one for $15,375, payable in four months, and the other for $15,000, payable in eight months from date with interest. Deegans was acting on behalf of the W. E. Deegans Coal Company. Shortly thereafter Deegans and his associates took over the operation of the Beckley Vein mine. They operated the property for about fourteen months and mined and sold from 12,000 to 15,000 tons of coal. They abandoned the mine in April, 1919, claiming that the coal had run out and that the mine was worthless. In September or October of that year and before this suit was brought, the Beckley Vein Coal Company pulled the props and pillars in a considerable portion of the mine, took down and sold the tipple, disposed of about ten four-room houses, took up the mine track, disposed of the mine motor, mine mules, and practically all of the company's property except the leasehold.

Matters were in this situation when plaintiffs brought this suit. Plaintiffs seek cancellation of the sale of the stock and tender the stock with their bill. As grounds for rescission they allege:

First, that defendant was their agent in purchasing the stock and that in order to induce Deegans as agent of the W. E. Deegans Coal Company to buy the stock defendant falsely represented to him that it could not be bought for less than $150 per share, while in fact the stock could have been bought at its par value of $100 per share; that Hedrick purchased the stock for much less than $150 per share and unloaded it upon the plaintiffs at $150 per share, thereby taking an unlawful profit unto himself, and,

Second, that defendant made various misrepresentations as to the coal mining plant, coal mining leasehold, and the coal vein or veins; that the defendant prevented plaintiff from making a proper examination of the inside of the mine and that defendant represented that the coal property had not been prospected or tested by the drilling of test holes; that

plaintiff later discovered that the leasehold was practically worthless and that there was but very little mineable coal in the premises; that in fact before the purchase of the stock the leasehold had been prospected and tested both on the outcrop and by core drills and found to be practically worthless, and that this was known to the defendant at the time he made the false representations to the plaintiffs, and they claim that by means of these false representations they were induced to purchase the stock.

This suit was instituted in September 1919, a little over a year and six months after the plaintiffs had taken over the property, and long after they discovered that the property was not what they alleged the defendant recommended it to be. They had operated the property for about fourteen months, had mined and sold therefrom some 12,000 or 15,000 tons of coal; had practically stripped the mine of all of its equipment, including tracks, mine motor, miners' houses, tipple, mine cars, and other property, and had left the mine in an abandoned condition. Many of the props and pillars had been pulled. All this was done before plaintiffs made a tender of the stock to the defendant, and before they offered to rescind. The mine property disposed of by the plaintiffs, or under their management, was sold at a nominal figure, though it cost more than $30,000. Under these circumstances it is impossible for plaintiffs to restore the property to the state it was in at the time they acquired the stock from the defendant. Had the plaintiffs acted promptly upon the discovery of the alleged fraud they might have been entitled to rescind, but it is well settled that one who elects to set aside a contract for fraud must do so without unnecessary delay after the discovery of the fraud, unless there be reasonable excuse for the delay; and rescission will not be permitted except under peculiar circumstances unless parties can be placed in statu quo. Here the parties continued to use the property for at least 12 months after having discovered that the mine was not what they claimed that defendant represented it to be; and after having abandoned it they delayed making any offer of rescission for nearly six months longer, so under these circumstances they were not entitled to rescission. In *Barnett* v. *Barnett*, 83 Va. 504, 2 S. E. 733, the court said: "The rule

is, that, where a party has a right to rescind a contract on the ground of fraud, he must rescind at once on discovering the fraud, or as soon thereafter as circumstances will permit; for he is not bound to rescind, and any unreasonable delay, especially if it be injurious to the other party, will be regarded as a waiver of his right. This is well settled.'' No satisfactory explanation is offered by plaintiffs for this unnecessary delay. Under the circumstances we do not think plaintiffs are entitled to rescind; hence it is unnecessary to inquire whether defendant committed fraud upon the plaintiffs in selling them the controlling stock in a worthless mine property.

Not being entitled to rescind, because of the change in the condition of the property and the unreasonable and unexplained delay on plaintiffs' part, can plaintiffs recover from defendant the profits he made in the transaction? That depends solely upon whether he was their agent. They say he was; he says he was not; that he was acting for himself and no one else.

We can not see how any one, in the light of the correspondence from which we have quoted, could deny that Hedrick was plaintiffs' agent in buying for them this stock. The last letter in the negotiations is the one from Deegans to Hedrick under date of February 15. Hedrick claims that this letter was never answered and that there was never any contract between him and Deegans binding Deegans to take the stock off his hands. We can not see the situation in that light. Deegans was in communication with Hedrick between February 15th and February 22nd. If not, how did it happen that he went to Beckley on the 21st, with the secretary-treasurer of the W. E. Deegans Coal Company, prepared to close the deal on the 22nd? Hedrick had informed Deegans he would have the stock ready for delivery on that day; of that there can be no doubt. Otherwise, Deegans would not have gone to Beckley. Hedrick did not need to accept Deegan's offer of February 15th by a written acceptance; it could have been and doubtless was accepted over the telephone, and became binding on Deegans the moment of acceptance. Hence, whatever stock Hedrick bought for delivery to Deegans under that contract was bought for plaintiffs and not for Hedrick. True, Dee-

gans, under the arrangement was not bound to take less than 51 per cent of the outstanding stock, but he was bound to take that amount the moment it was tendered to him. Immediately after February 15th Hedrick proceeded to option what stock he could and bought what he could not option. It is useless for one to say that Hedrick was going about blindly buying this stock, not knowing whether Deegans was going to take it. He knew Deegans wanted it, had agreed to take it and was responsible on his contract. The only possible chance Hedrick took was in case he bought stock he might be unable to buy the full 51 per cent, and thus not be in position to compel Deegans to take it off his hands.

Hedrick succeeded in securing 375 shares at various prices, ranging from $100 to $150 per share. He had 30 shares of his own. This made the 405 shares he sold plaintiffs. We have not the slightest doubt about Hedrick's agency. When he found he could buy this stock at less than $150 per share it was his duty to do so and let the plaintiffs know the truth about it, not pretend to them that he was compelled to pay $150 per share for it in order to get that amount from them and thereby reap a profit. The $1,000 mentioned in Deegan's letter was to be the compensation to Hedrick for his trouble. That was the only profit he was entitled to in the transaction.

We have said nothing about his conduct towards the stockholders of the Beckley Vein Coal Company, of which he was president and director; his duty toward them is not involved in this case. Seeing that he could not serve two masters, he decided to serve neither and take care of himself. But the law as well as good morals require an agent to be loyal to his principal; that is his first duty. And if he is authorized to purchase at a given price and purchases for less than that price, the amount saved by his efforts belongs to his principal. There is abundant authority for that proposition. See *Sutherland* v. *Guthrie*, 86 W. Va. 208, 103 S. E. 298, where the authorities and cases in point are cited and collected by Judge RITZ.

It follows from what we have said that defendant must be held to account to plaintiff for his profits. He took Sutphin in as a silent partner. The record shows that upon a division,

Sutphin's profits were $4,291.62 and Hedrick's $5,068.63, as shown by their testimony. They were not entirely frank about the prices they paid for various shares; though payments were made by checks, these were destroyed or lost, and there was not that full and fair disclosure that should have been made. We hold that Hedrick had no right to take in a silent partner and enable him to make a profit, but that Hedrick is responsible to the plaintiffs not only for the profits which he himself received but also for the profits which Sutphin received. Whether the sum of $5,068.63, stated as being the profit made by him, includes the $1,000 commission paid him by plaintiffs we can not say from the record. But the defendant is not only not entitled to any profits from the sale of the stock but he is not entitled to the $1,000 commissions paid him by the plaintiffs, and under the rule laid down in the Sutherland case he must repay to plaintiffs the $1,000 commissions paid him. Nor do we think defendant is entitled to $150 per share for the 30 shares originally owned by him and included in the 405 shares sold to plaintiffs, nor for the 25 shares owned by Sutphin, if he actually did own them before he became the silent partner of Hedrick, and which was also transferred to the plaintiffs; but upon an accounting Hedrick is entitled to a settlement based on the fair market value of his own and Sutphin's stock and a fair basis for that price would be found by taking the average price paid for all the shares exclusive of the Hedrick stock and the Sutphin stock. This of course means the price paid to the stockholders, not the price paid to Stuphin on any re-transfer or re-sale by him to Hedrick. On this basis an accounting should be had.

We will therefore reverse the decree, and remand the cause for further proceedings, to be had herein in accordance with the directions given, and the rules governing courts of equity.

*Reversed and remanded.*