No. 47,256

S. Mike Bessman, *Appellee,* v. David S. Bessman and Iris S. Bessman, *Appellants.*

(520 P. 2d 1210)

Opinion filed April 6, 1974.

*Donald E. Lambdin,* of Lambdin and Kluge, Chartered, of Wichita, argued the cause and was on the brief for the appellants.

*Allyn M. McGinnis,* of McGinnis and McGinnis, of El Dorado, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This action was originally brought as a mechanic's lien foreclosure. By some process of apparent acquiescence and tacit understanding on the part of both court and litigants, it was tried as an action for wages under an oral employment contract. The trial court rendered an accounting, charging defendants with plaintiff's wages for 73 weeks and a number of advances made by plaintiff on their behalf, and crediting them with various payments made to or for plaintiff by them and others. It struck a net balance in plaintiff's favor of $8,657.40 and rendered judgment for that amount. Defendants have appealed, contending primarily that plaintiff had, through disloyalty and gross misconduct, forfeited his claim to unpaid compensation.

Plaintiff S. Mike Bessman is the cousin of defendant David S. Bessman and the nephew of David's mother, the defendant Iris S. Bessman. In the summer of 1970 he was living in Las Vegas, Nevada, when he was approached by cousin David with an offer of employment. David and his mother Iris, who lived in Detroit, Michigan, owned a hotel in El Dorado, Kansas, known as the El Dorado Arms. They needed a manager, and offered the job to Mike. After some negotiation Mike accepted, and assumed his duties in El Dorado on August 21, 1970. Although there is some dispute over the terms of payment, the parties agree that Mike's salary was to be $250 per week.

As part of his duties as manager Mike was to oversee a general refurbishing of the hotel with a view to refinancing and possibly selling it. Soon after assuming those duties Mike embarked on a course of dealing with various contractors, suppliers, and one tenant, designed, among other objectives, to put cash in his pocket. The essential elements of these transactions were admitted by him either in answer to interrogatories or from the witness stand. He also admitted that his role in these transactions was never imparted by him to his employers. Five of these are relied on as invoking the "faithless servant" doctrine, and we shall describe them in chronological order.

1. *Lasting Interiors.* This firm did redecorating work on the hotel, the exact nature of which does not appear in the record. In the course of this litigation it was granted judgment and foreclosure of a mechanic's lien in the amount of $1,989.20, plus a personal judgment against David and Iris Bessman for $299.04.

In addition, it was apparently paid an undisclosed amount of money as work progressed. Mike Bessman, the plaintiff, gave the following answer to an interrogatory concerning this firm:

"Your plaintiff did make purchases on behalf of the hotel with funds of the El Dorado Arms from Earl Forgey of Lasting Interiors, and commissions were paid to your plaintiff in the amount of $800.00. The dates of these payments varied from October 16, 1970, up to and including September 16, 1971, and the plaintiff further states that the defendants were given credit for these commissions by a reduction of sums due and owing the plaintiff by the defendants, and those sums were disposed of by your plaintiff as his own just as he would have disposed of any other sums received on account of salaries or draws from the defendants."

This answer is typical of the answers to other interrogatories. The amounts Mike secretly received were characterized by him as "commissions," and they were pocketed by him as part of his salary. He was perfectly willing to give his employers credit for them, at least when the chips were down.

2. *Lewis and West.* This firm was the general contractor doing work on the hotel from October through December, 1970. During this time they employed Mike ostensibly to serve as timekeeper on the job and to run errands for them. They also employed a personal friend of Mike's, one Bonnie Brown, to do "accounting and auditing."

Between November 10, 1970, and January 26, 1971, four checks totalling $2,400 were drawn by Lewis and West, payable to "D. Michaels." It was agreed by the parties that this was a pseudonym for Mike Bessman. These checks were all endorsed by Mike, and he agrees he received cash for them. At least one of them was cashed for him by Oakley Andrews, the Lewis and West agent in charge of the job and the person who signed the checks. Checks to Ms. Brown totalled $850, and were payable to "B. Brown."

Andrews, the man who could best tell the Lewis and West version of the transaction, left that firm in August of 1972, and was apparently unavailable at the time of trial. An officer of the firm, who had filed a $22,438.89 lien on their behalf, testified that the firm files contained no subcontracts in the name of either "D. Michaels" or "B. Brown," nor were there any time records submitted by Mike or accounting records from Ms. Brown.

3. *Culligan Water Conditioning.* On January 22, 1971, Mike purchased an ice machine from this firm with $1,554.27 of hotel funds. He received a cash rebate of $300 which he pocketed and treated as salary.

4. *Reznick's Appliance Center.* In June, 1971, Mike bought six or eight air conditioning units from this firm with an undisclosed amount of the hotel's money. He received a cash "commission" from the firm of $398.65, which he likewise pocketed as salary.

5. *Lillian Strouse.* This lady served as bookkeeper for the hotel, and was a tenant as well. On August 10, 1971, she paid Mike $1,000, representing ten months' rent in advance less a 10% discount (although he gave her a receipt showing her rent was paid through August, 1972.) Mike kept the $1,000 and applied it on his salary. It was this transaction which brought about the end of Mike's employment. Mrs. Strouse told David Bessman about it on January 16, 1972, and he fired Mike the same day. The other transactions were discovered later.

Mike, it will be seen, regarded his personal acceptance of undisclosed "commissions," rebates and advance rentals as a form of self help, justified by the slow pay of his salary. (There was some dispute as to whether he was to be paid unconditionally, or only out of available profits; in any event payments to him from hotel funds amounted to only $7,455.) David and Iris, on the other hand, characterize them as "kickbacks" or peculations. They contend that the trial court erred in not applying the faithless servant doctrine to declare that he had forfeited all right to compensation during the period of his faithlessness.

In his brief Mike makes no direct response to that contention. He seeks to avoid the application of the doctrine by urging first, that "fraud" wasn't properly pleaded, and second, that the trial court refused to brand his actions as "misconduct." We shall examine these contentions first.

As previously noted, the petition alleged a contract to refurbish the property, and prayed for foreclosure of a mechanic's lien. The responsive pleading was in two parts, consisting of an answer and counterclaim. The answer amounted to a general denial. The counterclaim alleged an employment contract; that plaintiff had incurred expenses beyond his authority, resulting in liens for which he should be personally liable; and that he had received secret rebates and advance rentals without defendant's knowledge or authority. The prayer was for actual and punitive damages.

At the pre-trial conference various mechanics' liens were disposed of, but the record reveals no effort to define the issues to be tried in the main suit. Somewhere along the line plaintiff's

claim to a lien appears to have been abandoned. The judgment that was ultimately rendered foreclosed the first mortgage on the hotel as a first lien, and various mechanics' liens subordinate to the mortgage. Plaintiff, however, was awarded only a personal judgment, sharing in priority with other unsecured creditors.

The question is whether defendants' pleading is sufficient to raise the issue of plaintiff's alleged wrongdoing as a *defense* to his claim for wages. Plaintiff says that the defense is one which amounts to fraud, and as such must be pleaded as an affirmative defense in the *answer;* assertion of the fraud in the counterclaim is insufficient.

Defendants, on the other hand, say that their counterclaim was sufficient to put plaintiff on notice that his conduct was an issue in the case. They point to K. S. A. 60-208 (c), which provides:

"In pleading to a preceding pleading a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, *res judicata,* statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. *When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."* (Emphasis added.)

That statute is clear authority for characterizing defendants' pleading according to the facts alleged, regardless of the label placed on its individual parts by the pleader. It alleged facts amounting to fraud on plaintiff's part, and put him on notice that fraud would be an issue in the case. We therefore hold that if plaintiff's conduct alleged in the counterclaim could have been designated as a defense, it is proper to "treat the pleading as if there had been a proper designation." Whether it amounted to a legal defense we shall consider shortly.

The second aspect of Mike's plea of confession and avoidance rests on the trial court's reluctance to put the brand of misconduct on his actions. At the conclusion of the trial the court totaled up the debits and credits, prefacing its decision with, "All right. Let's get out our pencils." In a lengthy discourse from the bench the court first either allowed or disallowed each of Mike's claims. It allowed a number of items over which there is no present dispute, including employment tax liability, a bank loan made to Mike personally for the benefit of the hotel, telephone bills, cash ad-

vances and the like. It also allowed the salary claim in full (including $1,400 for operating the hotel's restaurant under a separate, later agreement). This is the contested issue.

As offsets the court allowed to David and Iris: the salary payments made; the $800 rebates from Lasting Interiors; the $300 rebate from Culligan; the $398.65 rebate from Reznick; the $1,000 advance rental from Mrs. Strouse; $360 in car payments; and cash advances of $310 for the expense of moving from Las Vegas to El Dorado. As to the Lewis and West transaction the court observed:

". . . Now, going over into this—whatever arrangements, deals, or it was Lewis and West Concrete Company. I don't care what it was and I don't particularly want to argue about it, but that is the way the cookie is going to crumble. In that regard the total money he received as D. Michaels—I think he obviously received it and probably an employee of the bank there—I don't know who it was—but the $2,400 payment and the $450 payments of checks to B. Brown will be allowed as a credit against the account—allowed for whatever that figure comes up where I think it is the right figure and as I have indicated before, gentlemen, if you disagree with it, you know your way to Topeka."

At this point counsel for the defendants specifically asked for a conclusion as to "misconduct." The court replied:

"Frankly, I think there was some conflict of interest in here. I don't know that it was misconduct and I don't want to label it as such now, but I don't think whatever arrangements were made between Lewis and West—I can only surmise on the Court's part what arrangements came about by the employment of Mike Bessman at the El Dorado Arms or whatever it was, I am sure tha[t] Mr. Mike Bessman would not have received the subcontract had he not been employed there and I think—and I have given credit back to David Bessman in that regard. Obviously, everything wasn't above board one way or the other. The paying of D. Michaels should waive [sic] the flag at all of us. I think to some extent that's probably one reason why the Court included the payments made to B. Brown as a credit."

It is on the basis of these comments by the trial court that Mike now urges that he was acquitted of "misconduct" by the trial court. Such a finding he says, is conclusive in this court on appeal.

We do not read the trial court's finding in quite the same way. First of all, it seems to us that the trial court was speaking only to the Lewis and West transaction. That was the thrust of the quoted remarks. Secondly, under the approach taken below it did not matter whether Mike's role be given the label of "misconduct" or merely, as it was, "conflict of interest." Under either label the *result* was to hold him accountable not only for the money paid to him but also that paid to Ms. Brown. (Mike, we note, took

no cross-appeal from this or any other part of the judgment.) The result reached below on this facet of the case can hardly be deemed an approval of his conduct.

In addition, the facts surrounding all of the transactions are admitted, and speak for themselves. The pattern they reveal is one of an agent secretly dealing in his principals' affairs for his own profit. In the transactions with Lasting Interiors, Culligan and Reznick there was no pretense of personal services rendered to the vendors in return for the rebates received; in the hands of a public official awarding similar contracts the rebates would be called bribes. When he pocketed Mrs. Strause's $1,000 advance rent belonging to his employers, he did that which, when done by bank tellers, has traditionally been called embezzlement.

There remains the question of whether plaintiff's conduct, by whatever name it is called, was such as to require the forfeiture of all or any part of his compensation. Defendants rely on the general rule stated in 56 C. J. S., *Master and Servant,* § 105:

> "A breach of the contract of employment other than by quitting the service may prevent a recovery of any wages thereunder, or of wages for the remainder of the term, as where the employee is guilty of *gross misconduct,* or *misconduct substantially affecting the contract of employment,* in the course of his employment, or has practiced *intentional fraud on his employer,* or has proved *disloyal to him in a manner substantially affecting the contract of employment,* or has assaulted his employer, or has falsified his accounts, or has stolen *or embezzled the money of his employer,* or committed other criminal offenses, although not immediately injurious to the person or property of the employer."

The history of this rule, at least as applied in New York, was recounted in *Herman v. Branch Motor Express,* 67 Misc. 2d 444, 445-6, 323 N. Y. S. 2d 794:

> "To begin with the earliest, in *Turner v. Kuowenhoven* (100 N. Y. 115, 120), the Court of Appeals stated that 'flagrant acts of dishonesty or crime which seriously affect the master's interest, *continued during the service,* might well be regarded as a bar to the recovery of wages, although the amount received and fraudulently appropriated might be far less than the amount fixed by the contract.' (Italics supplied.)
>
> "In *Abramson v. Dry Goods Refolding Co.* (166 N. Y. S. 771, 773, LEHMEN, J., the Appellate Term spoke as follows: 'where . . . the employer alleges facts sufficient to show dishonesty and disloyalty on the part of his employee which permeates the employee's service in its most material and substantial part, the employer cannot recover the agreed compensation; for he has failed essentially to give stipulated consideration for the agreed compensation, and is asking for pay for his own wrongdoing.'
>
> "The word 'permeate' is used in *Abramson* to describe a default so massive

that, for all practical purposes, the master has received no services from the servant. Because it has a temporal overtone, the word might also refer to dishonesty contemporaneous with the services for which the servant seeks payment. . . .

"In *Johnson v. Quayle & Son Corp.* (236 App. Div. 351, 352) the Appellate Division pointed out that, while normally an employee retains drawings in excess of commissions earned, 'the rule is different, however, when *during the time* the drawing account was operative the employee has been guilty of such a breach of the agreement as to disqualify him from earning the advances. In such a case there is an implied duty to repay such advances.' (Italics supplied.)

"In *Defler Corp. v. Kleeman* (19 A D 2d 396, affd. 19 N Y 2d 694), the decision upon which defendant primarily relies, the employees' dishonesty consisted in a conspiracy to exploit confidential information obtained by them while in plaintiff's service. The conspiracy became overt on May 14, 1958, when the defendants organized a firm called Carchem Products Corporation. With respect to plaintiff's demand for reimbursement of compensation paid to defendants, the Appellate Division directed that plaintiff recover for the period 'subsequent to May 14, 1958, the date on which the certificate of incorporation of Carchem was executed.' (P. 404.) Implicitly, then, the Appellate Division limited the extent of the taint to the time of the employees' dishonesty.

"And most recently, in *Tepfer & Sons v. Zschaler* (25 A D 2d 786, 787), the Appellate Division held that an employer might recover wages paid dishonest employees '*during the period* when, still employed by plaintiff, they were engaged' in disloyalty. (Italics supplied.)"

In the *Herman* case the employee was a truck driver with fourteen years of apparently flawless service; on the last day he stole several thousand dollars worth of cargo from his employer. The court, in the light of the summary quoted above, observed that "a careful reading of the precedents demonstrates that the bar to a faithless servant's recovery applies only to the period of his faithlessness." (Id., 67 Misc. 2d at 445.) Since such period in that case was only the last day of employment, the employee was not barred from recovering accrued back pay. (A set-off for the employer's loss would have been allowed if asked for.)

Illinois applies a similar rule. In *Steinmetz v. Kern.*, 375 Ill. 616, 32 N. E. 2d 151, the plaintiff, a widow unable to read English, had employed the defendant to manage an apartment house inherited from her late husband. In the throes of the depression the mortgage on the apartment house was foreclosed. Defendant, with plaintiff's money, had purchased some of the mortgage bonds. Later he redeemed the property from the foreclosure sale and took title in the name of a nominee. At plaintiff's suit a constructive trust was imposed on the property, but the trial court also allowed

defendant as an off-set compensation for his services in rescuing the building from the foreclosure sale. The Supreme Court of Illinois held this was error, noting:

". . . An agent is entitled to compensation only on a due and faithful performance of all his duties to his principal. (*Hafner v. Herron*, 165 Ill. 242.) In the application of this rule it makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal. (*Sidway v. American Mortgage Co.* 222 Ill. 270.) Under the facts disclosed by the record, the appellant [defendant] was not entitled to compensation." (Id., 375 Ill. at 621.)

The temporal aspect of the rule is pointed out in the early case of *Peterson v. Mayer.*, 46 Minn. 468, 49 N. W. 245, 13 L. R. A. 72, relied on by the New York courts in fashioning that state's rule. The plaintiff in that case was employed on a month-to-month basis, and worked for defendant for seven and one-half months when he was fired for embezzling. In his suit for wages, on the state of the record, the allegations of the answer were taken as true that such conduct had gone on regularly during each and every month of his employment. The court pointed out that the implied condition of faithful and honest service is just as much a condition of an employment contract as any express condition, observing:

". . . Indeed, if there is any case of non-performance of an entire contract which should prevent a recovery, it is where a servant has been habitually embezzling his master's money which came into his hands in the course of his employment; for, in such cases, not only is the breach the result of positive dishonesty, but it goes to the very root of the subjectmatter of the contract of service. To allow the dishonest servant to recover the value of his services, less what the master can show by direct and positive proof (often impossible) he had stolen, would neither subserve the ends of justice nor tend to promote common honesty." (P. 470.)

That the rule is not a rigid one was also pointed out, when the court went on to say:

"Of course, substantial, and not exact, performance, accompanied with good faith, is all the law requires in the case of any contract to entitle a party to recover on it. Although a plaintiff be not absolutely free from fault or omission in every particular, the court will not turn him away if he has in good faith made substantial performance, but will enforce his rights on the one hand, and preserve the rights of the defendant on the other, by permitting a recoupment. . . . Neither is the rule which we have applied to the present case to be extended so far as to forfeit wages already earned on a contract already fully performed and at an end. For example, in this case, had the plaintiff faithfully and honestly served the defendant during all of the first seven months, his wages for which were fully earned, they would not be

forfeited by a breach of the contract for the eighth month. But in the present case, according to the answer, the plaintiff, whose duties included the constant and daily receipt of defendant's moneys, failed to perform his contract for any month, having wilfully and dishonestly violated it in a most substantial and essential matter. Hence he never earned his wages for any of the months he was in defendant's service." (Ibid.)

As to the universal application of the rule we find the following in *Hey, Recr., v. Cummer.,* 89 Ohio App. 104, 97 N. E. 2d 702, a case involving a real estate agent's right to commissions for an extensive course of dealing in numerous tracts, in the course of which he had made secret profits:

"The first paragraph of the syllabus of *Lamdin v. Broadway Surface Adv. Corp., supra,* covering the same subject, is as follows:

"'An agent or employee of another is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. Not only must he account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal.'

"To the same effect are the cases of *Perry v. Engel,* 296 Ill., 549, 130 N. E., 340; *W. E. Deegans Coal Co. v. Hedrick,* 91 W. Va., 377, 113 S. E., 262; *Little v. Phipps,* 208 Mass., 331, 94 N. E., 260, 34 L. R. A. (N. S.), 1046; *Quinn v. Phipps,* 93 Fla. 805, 113 So., 419, 54 A. L. R., 1173; *Sutherland v. Guthrey,* 86 W. Va., 208, 103 S. E., 298. The rule stated in these cases seems to be a well established principle of law supported by courts and text writers and we have not been cited to nor do we find any authorities contra." (89 Ohio App. at 141.)

The parties cite us no Kansas cases, perhaps because we have not heretofore dealt with an agency relationship with the on-going characteristics of the ordinary employment contract. We nevertheless have a substantial body of law dealing with the right of the faithless servant to compensation for his services. Our earliest case, *Sumner v. Reicheniker,* 9 Kan. 320 (1872), is in general accord with the Minnesota court's declarations in *Peterson v. Mayer.,* supra. Sumner sued his agent Reicheniker for balances due under a contract whereby the defendant was employed to sell sewing machines on a commission basis; the defendant made a claim for commissions earned. On rebuttal the plaintiff offered evidence, which was rejected, to show that the agent-defendant had improperly retained moneys of his principal and had not been a faithful and energetic agent. The court held that the rejection of this testimony was error. Speaking through Mr. Justice Brewer the court said:

". . . An agent's right to commissions is not absolute. It depends on the manner of performing his duties. It probably would not be forfeited by

a simple lack of energy. But it might be by an improper retention of his principal's funds, or by acts of unfaithfulness to his trust. True, not every slight omission of duty will work a forfeiture; nor are we able to indicate beforehand, in this case, how grievous must have been the omission to deprive the agent of compensation. We cannot even conjecture whether any dereliction of duty can be shown. It is enough to say that the plaintiff had a right to show it if he could, and that he sought to do so and was refused." (9 Kan. at 323.)

The court went on to quote with approval Story's Agency, § 331:

". . . In the next place the agent is entitled to his commissions only upon a due and faithful performance of all the duties of his agency in regard to his principal. . . . If, therefore, the agent does not perform his appropriate duties, or if he is guilty of gross negligence, or gross misconduct, or gross unskillfulness in the business of his agency, he will not only become liable to his principal for any damages which he may sustain thereby, but he will also forfeit all his commissions. Slight negligence or slight omissions of duty will not indeed ordinarily be visited with such serious consequences, although if any loss has occurred thereby to the principal it will be followed by a proportionate diminution of the commissions." (Ibid.)

The principle was quickly applied to a court-appointed fiduciary in *Dryfoos v. Cullinan, Adm'r.*, 17 Kan. 452 (1877). There, Dryfoos failed to account as administrator of a decedent's estate and was removed. When he and the sureties on his bond were sued they attempted to set up his statutory commission as a set-off. The court cited *Sumner v. Reicheniker*, supra, for the proposition that "When a person is unfaithful to a trust confided in him, and compels the parties interested therein to resort to litigation to protect their rights, he forfeits his right to compensation for his services." (17 Kan. at 454.) As to the claimed right under the statute the court said:

". . . The section relied upon to give Dryfoos compensation was evidently intended to recompense an executor or administrator who performed beneficial services to an estate, or, in other words, who complied with the provisions of law regulating the discharge of his duties. To allow the six per centum claimed, as a valid reduction from the moneys wrongfully detained by Dryfoos, after his removal from his trust, would distort the evident object of the law. The compensation provided, is for the services of executors and administrators; and to construe the section as contended for by the counsel of plaintiffs in error would make such compensation equally applicable for the payment of intentional or willful neglect of duty, as for services actually performed." (Ibid.)

The principle has been consistently followed in this state. "The relation existing between a principal and agent is a fiduciary one demanding conditions of trust and confidence which require of

the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of his beneficiary." *(Merchant v. Foreman,* 182 Kan. 550, 322 P. 2d 740, Syl. ¶ 2.) We have repeatedly held that an agent who realizes a secret profit through his dealings on behalf of his principal not only must disgorge the profit but forfeits the compensation he would otherwise have earned. *Jeffries v. Robbins,* 66 Kan. 427, 71 Pac. 852; *Deter v. Jackson,* 76 Kan. 568, 92 Pac. 546; *Krhut v. Phares,* 80 Kan. 515, 103 Pac. 117; *Frowe v. McPheeters,* 122 Kan. 420, 251 Pac. 1105; *Doty v. Morrow,* 143 Kan. 395, 54 P. 2d 940; *Bradrick v. Woodward,* 148 Kan. 784, 84 P. 2d 885.

Likewise, a court-appointed fiduciary may be deprived of compensation for the commingling of funds and inadequately accounting for them *(In re Estate of Jones,* 174 Kan. 506, 257 P. 2d 116), or for appropriating money of the estate *(In re Simmons Estate,* 136 Kan. 789, 18 P. 2d 117), or for self-dealing for his own profit *(Vincent v. Werner,* 140 Kan. 599, 38 P. 2d 687). In the last case the executor was not only surcharged for the profits he derived, but the court went on to hold:

"An unfaithful executor or trustee is not entitled to compensation for his services, and where, as a result of litigation over the final accounts of an executor, it is held that he was unfaithful in his management of the estate his accounts should be surcharged *with the amounts paid him as compensation from the time he first became executor."* (Syl. ¶ 5. Emphasis added.)

The rules enunciated in all the foregoing cases are recognized by the American Law Institute in its restatement of both the law of trusts and that of agency. In the former, Restatement (Second) of Trusts, § 243 states:

"If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation."

The authors' explanatory comments indicate:

". . . In the exercise of the court's discretion the following factors are considered: (1) whether the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust."

". . . If the trustee repudiates the trust or misappropriates the trust property or if he intentionally or negligently mismanages the whole trust, he will ordinarily be allowed no compensation." (Ibid.)

In its work on agency the institute states:

"An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services *for which no compensation is apportioned.*" (Restatement [Second] of Agency, § 469. Emphasis added.)

The authors' comments once again elucidate:

"An agent is entitled to no compensation for a service which constitutes a violation of his duties of obedience. See § 385. This is true even though the disobedience results in no substantial harm to the principal's interests and even though the agent believes that he is justified in so acting."

"A serious violation of a duty of loyalty or seriously disobedient conduct is a wilful and deliberate breach of the contract of service by the agent, and, in accordance with the rule stated in Section 456, the agent thereby loses his right to obtain compensation for prior services, *compensation for which has not been apportioned.*"

"If the principal, in ignorance of the agent's faulty conduct, pays to the agent compensation or indemnity to which he is not entitled, the principal can maintain an action to recover the amount." (Ibid. Emphasis added.)

The emphasized language, referring to services for which no compensation has been "apportioned," is in line with the New York and Minnesota cases discussed above. Thus a minor breach of duty, affecting only a single transaction, will not result in loss of compensation attributable and "apportioned" to other transactions properly carried out. On a temporal basis, a defalcation in one month will not necessarily cause a forfeiture of compensation for other months when services are performed in an unexceptionable manner. This is the concept denoted by the New York rule that the faithlessness must "permeate" the service to cause a *total* loss of compensation, and of the restaters' criteria for exercising judicial discretion in allowing or denying compensation to a trustee.

Our research has revealed only one case in which this court has applied this qualification of the general rule of forfeiture, and that is *Hubbard v. Irrigating Co.,* 53 Kan. 637, 36 Pac. 1053. There, one Lord, a deceased banker, had been engaged to sell $10,000 worth of the irrigating company's bonds, for which he was to receive a $1,200 commission. He in fact sold $19,000 worth, which was beyond his authority, and also failed to remit any of the proceeds. In an action against his administrator the company recovered its $19,000, less previous advances, by way of an implied trust imposed on Lord's estate. The trial court refused to allow any compensation for selling the extra $9,000 worth of bonds, but

did allow the administrator an offset of $1,200 for Lord's services in selling the first $10,000 worth. On appeal this court said:

".  .  . It is urged that, having violated his trust, he has forfeited all right to compensation. The sale of $10,000 of the bonds was authorized, however. It was only when that sum was exceeded that he acted beyond his authority, and the court has allowed him no compensation for the excess. In an equitable action, such as this is, we should be loathe to disturb the judgment of the trial court in refusing to enforce a forfeiture of compensation because of a misappropriation, where the effect of a reversal would be not to deprive Lord himself of the allowance, but to deprive his other creditors of it." (Id., 53 Kan. at 653.)

There was thus an apportionment of the unfaithful agent's compensation, on equitable grounds, with compensation being allowed for that part of the agent's conduct which was proper and which was severable from his unauthorized acts. The estate was insolvent and the court was obviously concerned about the rights of Lord's other creditors. Had he been alive to reap the fruits himself the result, it was hinted, might have been different.

In applying these principles to the case at bar, we must start with the proposition that Mike Bessman was, undeniably, a "faithless servant" within the doctrine set forth in the foregoing authorities. There cannot be even a colorable claim of good faith on his part. He cannot, then, claim the full compensation which would have been due him had he performed with the fidelity expected of a trusted agent and employee.

We must then seek to ascertain the "period of his faithlessness." (*Herman v. Branch Motor Express*, supra.) We find from his sworn answer to interrogatories, quoted above, that he received rebates from Lasting Interiors at various dates, which he could or would not specify, "from October 16, 1970, up to and including September 16, 1971." Examination of the other defalcations reveals that they all fell within this period of time: Lewis and West, November, 1970, to January, 1971; Culligan, January, 1971; Reznick's, June, 1971; and Mrs. Strouse, August, 1971. There is no evidence in the record of any misconduct either before or after that period. We concluded from the undisputed record that the period of faithlessness was that period which plaintiff has admitted. While there may have been lapses into righteousness during that period, we cannot cut it any finer.

We therefore hold that plaintiff was not entitled to his salary for the forty-eight week period beginning October 16, 1970, and

ending September 16, 1971. At $250 per week, the judgment below overpaid him by $12,000. The judgment is reversed and the case is remanded with directions to enter an appropriate judgment on the account taken, disallowing the $12,000 compensation specified above.

APPROVED BY THE COURT.