2004 UT 26

PRINCE, YEATES & GELDZAHLER, a professional corporation, Plaintiff, Counterclaim Defendant, Appellant, and Cross–Appellee,

v.

Robert S. YOUNG, Defendant, Counterclaimant, Appellee, and Cross–Appellant.

No. 20020347.

Supreme Court of Utah.

March 30, 2004.

M. David Eckersley, Salt Lake City, for plaintiff.

Samuel O. Gaufin, Daniel L. Berman, Salt Lake City, for defendant.

WILKINS, Justice:

¶ 1 Plaintiff Prince, Yeates & Geldzahler ("Prince Yeates" or "the firm") appeals the district court's denial of the firm's motion for summary judgment on defendant Robert S. Young's counterclaim for breach of express contract and its grant of partial summary judgment to Young on the firm's breach of fiduciary duty claim. We reverse.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 In April 1995, Prince Yeates hired Young as an associate attorney. Previously, Young had spent the majority of his twelve-year legal career as general counsel for Rocky Mountain Helicopters, where he acquired considerable experience in helicopter crash litigation. Prior to joining Prince Yeates, Young met with John Ashton, the firm's then-president, to discuss compensation. Under the terms of his original employment agreement, which was never reduced to writing, Young accepted a starting salary of $70,000 per year. During their discussions, Ashton also indicated to Young that the firm would evaluate his performance after the first year and that, as a general rule, attorneys at Prince Yeates typically received increased compensation based on performance and positive results. In addition, with respect to becoming a shareholder, Ashton told Young that, depending upon his performance, the usual partnership track for a lateral hire with Young's experience ranged from two to three years.

¶ 3 In 1996, Young agreed to represent Charles Krause, who had sustained serious injuries in a helicopter crash, in a personal injury action in Texas. At approximately the same time, Young also undertook the representation of Mountain West Helicopters, the owner of the helicopter involved in Krause's accident, in a related lawsuit filed in federal court in Utah. As well as being the originating attorney, Young was the only lawyer at Prince Yeates who performed any work on either case.

¶ 4 For the next two years, Young spent considerable time on these two contingent fee cases, which resulted in lower collections and higher work-in-process figures compared to other Prince Yeates attorneys. As a result, some members of the firm began to question Young's overall profitability · and readiness to become a shareholder. In September 1998, perhaps sensing this tension, Young inquired as to how the contingent fee in the Krause case (assuming a successful outcome) would be divided between himself and Prince Yeates. The firm's Board of Directors ("the Board") responded by assigning Ashton and John Chindlund, Prince Yeates' then-president, to explore the possibility of reaching an agreement with Young on the Krause fee.

¶ 5 Between December 1998 and May 1999, Ashton and Chindlund met with Young on several occasions to negotiate an appropriate allocation of the Krause fee. Throughout these meetings, both Prince Yeates (represented by Ashton and Chindlund) and Young communicated their intention to· be "fair" with each other in attempting to determine the amount of "fair and equitable" compensation that Young would

receive from the Krause fee. Ultimately, the two parties reached a tentative verbal agreement under which Young would take one-third of the Krause fee, with the remaining two-thirds going to the firm. On May 5, 1999, Chindlund memorialized this proposal in writing and requested that Young sign it to acknowledge his acceptance. Young did not sign.

¶ 6 On June 14, 1999, Young learned that the Krause case had settled three days earlier at a mediation in Texas, which he did not attend, and that the contingent fee recovery would be nearly $650,000. The following day, June 15, without disclosing his knowledge of the settlement to his employer, Young made a counteroffer to the firm's May 5 proposal. In his counteroffer, Young agreed to divide the Krause fee one-third to himself and two-thirds to the firm, provided Prince Yeates made him a shareholder, allowed him a voice in that year's bonus distribution, and guaranteed an increased salary for the next two years. According to Young, over the course of their numerous meetings, Ashton and Chindlund promised him that the firm would fulfill these additional conditions upon the successful resolution of the Krause case. Ashton and Chindlund denied making such promises, and the firm did not respond to Young's proposal. Finally, on July 2, Young wrote a memo to the Board, informing them that he would leave Prince Yeates in two weeks if an agreement could not be reached on his counteroffer. The firm accepted Young's resignation on July 7.

¶ 7 After his departure, Prince Yeates learned that Young had represented certain clients during 1998 and 1999 without disclosing the representation to the firm, while simultaneously using firm resources and filing pleadings in the firm's name in connection with these matters. In addition, Young retained all fees derived from these cases for himself. Prince Yeates then filed suit against Young for breach of fiduciary duty, and Young counterclaimed alleging, among other causes of action, breach of oral contract. The firm twice moved for summary judgment on Young's counterclaim, and the district court denied both motions with respect to the contract claims. Prince Yeates and Young also each moved for partial summary judgment on the breach of fiduciary duty claim. The district court denied the firm's motion, granted Young's, and the case proceeded to trial.

¶ 8 At trial, the special verdict form asked the jury to determine if Young "was entitled to additional compensation as a result of the Krause fee either under his original oral employment contract or a valid contract with regard to the helicopter cases." The jury answered in the affirmative and determined that $280,000 represented "the fair and reasonable amount of the fee" owed to Young.

¶ 9 On appeal, Prince Yeates challenges (1) the district court's denial of its two summary judgment motions on Young's breach of contract counterclaim; (2) the district court's grant of partial summary judgment to Young and denial of partial summary judgment to the firm on its breach of fiduciary duty claim; (3) the district court's denial of Prince Yeates' motion for a directed verdict on the counterclaim; (4) the sufficiency of the evidence presented by Young to support the jury verdict; and (5) the district court's refusal to allow the firm to introduce evidence of Young's competing law practice. On cross-appeal, Young asserts that the district court erred when it denied his post-trial request for attorney fees, expenses, and pre-judgment interest. Because the case is fully resolved by our analysis of the district court's summary judgment rulings, we do not address the other issues raised.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 10 We review the district court's rulings on summary judgment motions for correctness. *Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 14, 10 P.3d 338; *see* Utah R. Civ. P. 56(c). In the context of cross-motions for summary judgment, we examine each motion separately, viewing the facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Surety Underwriters*, 2000 UT 71 at ¶ 15, 10 P.3d 338.

## II. BREACH OF EXPRESS CONTRACT

¶ 11 Young asserts that Prince Yeates entered into two separate express contracts with him: (1) the original 1995 oral employment agreement; and (2) the discussions between Ashton, Chindlund, and Young regarding the "fair and equitable" division of the Krause fee. We review each in turn.

### A. The Original Employment Agreement

¶ 12 Under the terms of his original oral employment agreement, Young accepted Prince Yeates' offer to become an associate attorney at a starting salary of $70,000 per year. In previous conversations, Ashton indicated to Young that, as a general rule, attorneys at the firm typically received increased compensation based on performance, and that the usual shareholder track for a lateral hire with Young's experience ranged from two to three years. Although nothing was ever reduced to writing, Young claims that these representations created an express contract under which Prince Yeates agreed to pay him additional compensation contingent upon positive performance. Young then argues that his recovery of the Krause fee constitutes contractual performance sufficient to warrant increased remuneration. We disagree.

¶ 13 In *Nielsen v. Gold's Gym*, we noted that " 'a meeting of the minds on the integral features of an agreement is essential to the formation of a contract' " and, consequently, " '[a]n agreement cannot be enforced if its terms are indefinite.' " 2003 UT 37, ¶ 11, 78 P.3d 600 (quoting *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996)). Here, Ashton and Young discussed the general relationship between performance and compensation at Prince Yeates. At no point in these conversations did Ashton represent to Young that the firm would pay him a specific amount of additional compensation in the future, or that Young was guaranteed to become a shareholder. Furthermore, Ashton never provided, nor did Young ask for, clarification on what exactly constituted "performance" sufficient to trigger increased compensation. Rather, Ashton merely communicated Prince Yeates' usual practice; namely, that as a *general rule*, attorneys at the firm *typically* received additional compensation if they performed well.

¶ 14 Without some definite language addressing the amount, timing, or conditions of *Young's* potential additional compensation, Ashton's comments represent "only the facade of a promise, ... statement[s] made in such vague or conditional terms that the person making [them] commits himself to nothing." *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1036 (Utah 1985). Such statements "neither bind[ ] the person making [them] ... nor function[ ] as consideration for a return promise." *Id.* In short, "where there was simply some nebulous notion in the air that a contract might be entered into in the future, the court cannot fabricate the kind of a contract the parties ought to have made and enforce it." *Valcarce v. Bitters*, 12 Utah 2d 61, 362 P.2d 427, 428–29 (1961). Therefore, based upon the uncontested material facts viewed in the light most favorable to Young, we hold as a matter of law that Ashton's broad, indefinite statements to Young pertaining to the general relationship between performance and compensation did not create an express contract binding Prince Yeates to pay Young greater compensation, or advance him to shareholder status. As a result, the district court erred when it denied Prince Yeates summary judgment on Young's counterclaim.

### B. The Krause Fee Discussions

¶ 15 In addition, Young also contends that Prince Yeates entered into a second express contract when Ashton and Chindlund communicated the firm's intention to be "fair" in negotiating the amount of "fair and equitable" compensation that he would receive from the Krause fee. Again, we disagree.

¶ 16 Like his earlier argument on the original employment agreement, Young's claim fails because the firm's statements regarding the anticipated "fair and equitable" division of the Krause fee were too indefinite to create an express contract. Our prior jurisprudence clearly establishes that a contract cannot exist without a meeting of the minds

on the central features of the agreement. *See Nielsen*, 2003 UT 37 at ¶ 11, 78 P.3d 600; *Tsern*, 928 P.2d at 373. Simply stated, "[a] condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced." *Valcarce*, 362 P.2d at 428.

¶ 17 Here, although Prince Yeates and Young each expressed their intention to allocate the Krause fee in a "fair and equitable" manner, no agreement was ever reached on the integral feature of the alleged contract—Young's compensation. Other than the tentative one-third/two-thirds division outlined in Chindlund's May 5, 1999 memo, which Young expressly rejected with his counteroffer, the parties never agreed upon the specific amount of, or formula to determine, Young's share of the Krause fee. In the absence of any consensus on actual numbers or adoption of a mutually satisfactory method of calculating "fair and equitable" compensation, Prince Yeates' stated desire to be "fair" to Young, standing alone, is too indefinite to create a contractual obligation. "So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a completed contract. In fact, there is no contract at all." *Candland v. Oldroyd*, 67 Utah 605, 248 P. 1101, 1102 (1926). *See also Tsern*, 928 P.2d at 373–74 (noting that "when parties have not agreed on a reasonable price or a method for determining one, 'the agreement is too indefinite and uncertain for enforcement'" (quoting 1 Joseph M. Perillo, *Corbin on Contracts* § 4.3 (rev. ed.1993))). Other jurisdictions also take this approach. *See Freedman v. Pearlman*, 271 A.D.2d 301, .706 N.Y.S.2d 405, 407–08 (App.Div.2000) (holding that "alleged promises ... to provide 'fair compensation' and to 'equitably' divide the draw were too indefinite to be enforced"); *Turcott v. Gilbane Bldg. Co.*, 94 R.I. 225, 179 A.2d 491, 492–93 (1962) (same).

¶ 18 In sum, Prince Yeates' commitment to be "fair" to Young in attempting to determine his "fair and equitable" compensation

from the Krause fee was too indefinite to create an express contract. Again, viewing the material facts in the light most favorable to Young, we reverse the district court and hold, as a matter of law, that Prince Yeates was entitled to summary judgment on Young's counterclaim.

## III. BREACH OF FIDUCIARY DUTY

¶ 19 Prince Yeates next argues that Young breached his fiduciary duty of loyalty—specifically, a duty of non-competition—when he represented clients in the firm's name without disclosing the representation to the firm, expended firm resources and filed pleadings in the firm's name in connection with these matters, and retained all fees derived from these cases for himself.[1] The district court denied Prince Yeates' motion for partial summary judgment on the issue of liability and granted Young's cross-motion, reasoning that, as a mere employee, he owed no fiduciary duty of non-competition to the firm. Once more, we disagree.

¶ 20 As a general matter, the second Restatement of Agency provides that "[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." *Restatement (Second) of Agency* § 393 (1958). Furthermore, "[t]he rules as to the duties and liabilities to the principal of agents who are not servants [also] apply to servants." *Id.* at § 429. While the Restatement does not specifically include "employees" as "agents," it does refer to "servants," a term synonymous with "employees." *See Black's Law Dictionary* 1372 .(7th ed.1999) (defining "servant" by pointing to the definition of "employee").

¶ 21 Although this court has not directly addressed the issue of whether "mere employees" owe their employers a fiduciary duty of non-competition, other jurisdictions have. In *Fryetech, Inc. v. Harris*, the defendants argued that the fiduciary duties of good faith and loyalty did not apply to "mere employees." 46 F.Supp.2d 1144, 1152 (D.Kan.1999). The court rejected this con-

1. In addition, by invoking Prince Yeates' name, Young also effectively made the firm liable for any professional liability arising from the representation.

tention, emphasizing that "[w]hile most of the cases which have addressed the fiduciary responsibilities of agents ... have involved corporate directors or officers, there is no basis for concluding these are the only types of agents subject to fiduciary duties." *Id.* Rather, "the cases speak of the duties of agents without respect to their exact status." *Id.; see also Bessman v. Bessman*, 214 Kan. 510, 520 P.2d 1210, 1217 (1974) ("An agent or employee of another is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." (internal quotations omitted)); *Chernow v. Reyes*, 239 N.J.Super. 201, 570 A.2d 1282, 1283, 1284 (Ct.App.Div.1990) (holding that even though an employee's oral employment contract did not specifically prohibit competition, "[a]n employee owes a duty of loyalty to the employer and must not, while employed, act contrary to the employer's interest," which necessarily includes "a duty not to compete with the employer's business").

¶ 22 In response, Young cites *Microbiological Research Corp. v. Muna*, 625 P.2d 690 (Utah 1981), ostensibly for the proposition that, under Utah law, "mere employees" owe no fiduciary duties to their employers. Young misreads *Muna*. This court in *Muna* noted that when a corporate officer no longer serves in that capacity due to resignation or removal, but remains as an employee, the fiduciary relationship *may* cease, depending on the factual circumstances. 625 P.2d at 695. However, it is incorrect to conclude, as Young does, that this observation somehow inevitably leads to the conclusion that employees necessarily have *no* fiduciary duties to their employers.[2] That is not the case. Moreover, Young cites no additional applicable law from this or any other jurisdiction.

¶ 23 In the relationship of a lawyer and his or her employer, there does exist a duty of honest and ethical behavior. Because of the privilege granted to engage in the practice of law, we impose upon members of our bar a fiduciary duty that encompasses the obligation to not compete with their employer, which we define as any law firm or legal services provider who may employ them in a legal capacity, without the employer's prior knowledge and agreement.

¶ 24 We therefore hold, as a matter of law, that the district court erred in denying Prince Yeates' motion for partial summary judgment on its breach of fiduciary duty claim and in granting Young's cross-motion. To hold otherwise would imply that attorneys are free to join law firms, derive benefits from that association, and essentially operate as sole practitioners while simultaneously receiving a salary and using firm resources for their independent legal activities. If Young was unhappy at Prince Yeates, he was free, as an at-will employee, to leave at any time and presumably take those clients who wished to follow him. Merely because he was afraid that his interest in the Krause fee would be jeopardized does not justify his non-disclosure of representation and subsequent retention of fees. He had a higher duty to Prince Yeates than that. With that in mind, we now turn to the question of the firm's remedy.

## IV. REMEDY

¶ 25 Regarding an appropriate remedy, Prince Yeates urges us to require the forfeiture of both Young's share of the Krause fee (determined by the jury to be $280,000) and all compensation paid by the firm to Young from January 26, 1998 through July 7, 1999–the time period during which Young breached his fiduciary duty of noncompetition. To support this argument, Prince Yeates cites several cases from other jurisdictions where courts imposed total forfeiture upon disloyal employees. *See, e.g., Bon Temps Agency Ltd. v. Greenfield*, 184 A.D.2d 280, 584 N.Y.S.2d 824, 825–26 (App. Div.1992); *Vendo Co. v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1, 14 (1974).

¶ 26 Although we acknowledge that total forfeiture may be proper in certain circumstances, we decline to implement such a harsh remedy in this case. Given that the number of undisclosed clients and the

---

**2.** We need not, and do not, decide today whether all "mere employees" owe fiduciary duties to their employers to not compete with the employer's legitimate business interests.

amount of retained fees were comparatively small, Young's conduct, while unquestionably giving rise to liability, does not warrant so punitive a sanction. Moreover, with our reversal today of the summary judgment rulings already described, Young has no share of the Krause fee to forfeit, due in no small part to Young's own lack of honesty and candor with Prince Yeates when the Krause case was settled. However, we do hold that the appropriate remedy for Young's breach of fiduciary duty is the disgorgement of the fees charged and collected by Young while employed at the firm but not previously paid over to Prince Yeates. As such, we remand this issue to the district court, with instructions to determine the amount of those fees and order their payment to the firm forthwith.

## CONCLUSION

¶ 27 We reverse the district court's denial of summary judgment to Prince Yeates on Young's counterclaim for breach of express contract. With respect to the original employment agreement, we hold that Ashton's statements to Young addressing the general relationship between performance and compensation were too indefinite to create an enforceable contract term. Likewise, Prince Yeates' commitment to be "fair" to Young in determining his "fair and equitable" compensation from the Krause fee was similarly indefinite, and therefore insufficient to give rise to an enforceable contract.

¶ 28 Secondly, we reverse the district court's denial of the firm's partial summary judgment motion on the issue of liability for breach of fiduciary duty, and its attendant grant of Young's cross-motion. We hold that Young breached his fiduciary duty of non-competition when he represented clients without disclosing the representation to Prince Yeates, expended firm resources and filed pleadings in the firm's name in connection with these matters, and retained all fees derived from these cases for himself. As such, we further hold that the appropriate remedy for Young's breach is the disgorgement of those ill-gotten fees to Prince Yeates. We reverse and remand for proceedings consistent with this opinion.

¶ 29 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Judge McIFF concur in Justice WILKINS' opinion.

¶ 30 Having disqualified himself, Justice NEHRING does not participate herein; District Judge K.L. McIFF sat.