**BURTON ENTERPRISES, INC., a corporation, d/b/a Livingston, Plaintiff,**

v.

**Kent WHEELER, Defendant.**

**Civ. A. No. 84-2177-S.**

United States District Court,
D. Kansas.

Sept. 17, 1986.

Carter H. Kokjer, J. David Wharton, Kokjer, Kircher, Bradley, Wharton, Bowman & Johnson, Kansas City, Mo., Larry J. Austin, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, Kan., for plaintiffs.

Frank H. Jenkins, Jr., Olathe, Kan., Michael G. Norris, Joseph Ebbert, Niewald, Waldeck, Norris & Brown, John P. Bennett, Cloon & Bennett, Overland Park, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This is an action for unpaid sales commissions in which the counterclaim plaintiff, Kent Wheeler, claims he was wrongfully denied compensation for sales that he made before his termination as a sales rep-

resentative for counterclaim defendant Burton Enterprises, Inc., d/b/a Livingston. The matter was tried to the court on August 27, 1986. After reviewing the evidence and the briefs submitted by the parties, the court is ready to make its decision.

## FINDINGS OF FACT

1. Livingston Industries, Ltd. manufactured and sold laundry chemicals for commercial and institutional laundries and car washes.

2. Kent Wheeler was a sales representative for Livingston Industries, Ltd. during a period prior to and during calendar year 1983.

3. During his employment with Livingston Industries, Ltd., in September 1983, Wheeler recruited one Joe Collins as a salesperson for the company. During their discussions, Wheeler intimated the possibility of some day forming his own company and possibly bringing Collins in on the new venture. Collins thereafter joined Livingston Industries, Ltd. as a sales representative.

4. Sometime in September 1983, Livingston Industries, Ltd. went into voluntary foreclosure on its bank loan. In late September or early October 1983, Burton Keith Wasser became interested in pursuing the purchase of Livingston Industries, Ltd.'s assets.

5. Pursuant to his contemplated purchase, Wasser met with Wheeler on October 26, 1983, to discuss the future of the proposed new company. Wasser had information that Wheeler was an excellent salesperson, accounting for 60–65% of Livingston Industries, Ltd.'s sales. Wasser reasonably believed that the viability of a new company formed with Livingston Industries, Ltd.'s assets would depend in large part on Wheeler remaining with the company.

6. Wasser and Wheeler agreed that in consideration for Wheeler's remaining with the company, Wasser would pay Wheeler $12,219.79 in commissions allegedly owed to Wheeler by the defunct Livingston Industries, Ltd. Under Kansas law, Wasser apparently was not legally obligated to assume this debt.

7. The parties established no definite duration for Wheeler's continued employment. The agreement did not contain a covenant not to compete, and the parties executed no formal contract to memorialize their agreement.

8. On October 28, 1983, Wasser bought only the assets of Livingston Industries, Ltd. by making the defaulted loan payment. The new entity was called Burton Enterprises, Inc., d/b/a Livingston. Wheeler went to work as a sales representative for the new company, and he was in fact paid the $12,219.79 upon which he and Wasser had agreed. Joe Collins also continued his employment with the new company.

9. Due to the uncertainty caused by the financial instability of Livingston Industries, Ltd. and the subsequent purchase by Burton Enterprises, by late October, 1983, Wheeler began to seriously pursue the formation of a new business in the same product line as Burton Enterprises. Sometime in November 1983, Wheeler expressed renewed optimism to Joe Collins concerning the formation of a new company to compete with Burton Enterprises. In the period from late October to early December, 1983, Wheeler had several meetings with Larry Carden and Doug Livingston concerning the formation of such a company. Both of these men had extensive experience in the chemical detergent business. Wheeler was still an employee of Burton Enterprises at this time.

10. In early December, 1983, Wheeler, Carden, and Livingston offered to purchase a building suitable for use in their contemplated venture. They succeeded in purchasing the building on December 15, 1983. Wheeler contributed some of the money for the purchase of the building and became a 22% owner of the structure.

11. Sometime in late December or early January, Wheeler informed Joe Collins that the new company was formed, and invited Collins to participate as part owner.

12. By early January, 1984, Wheeler knew that the building he helped purchase was being equipped to manufacture and distribute products in direct competition with Burton Enterprises.

13. Business cards representing Wheeler as National Sales Manager of "Formula One—Cleaning Concentrates and Equipment, D.E. Livingston and Associates, Inc." were ordered sometime around January 17, 1984, by Doug Livingston. Wheeler knew that this would be his job title upon formally joining the Formula One company.

14. Sometime in January 1984, Joe Collins attended a meeting at Doug Livingston's residence, in which he learned that the venture was complete and that he and Wheeler could begin as sales representatives for the Formula One company as soon as the products were available for marketing.

15. On February 17, 1984, both Wheeler and Collins suddenly quit their employment at Burton Enterprises. Wasser was out of town that Friday and did not learn of the resignations until the next week. On February 20, 1984, both began their employment with the Formula One company.

16. Prior to February 20, 1984, Wheeler never attempted to make sales on behalf of Formula One. His sales were made exclusively for Burton Enterprises, and they never decreased in number prior to his termination date. In fact, during the latter weeks of his employment with Burton Enterprises, his sales for the company may have actually increased.

17. Wheeler generated $12,069.47 in commissions for Burton Enterprises prior to his termination date, for which he never received payment.

18. After resigning on February 17, 1984, Wheeler continued to call on former customers of Burton Enterprises in order to obtain their business on behalf of Formula One. To this end, Wheeler submitted a letter to some customers, stating in part the following:

We will maintain the consistency of product quality, pricing, and service. There will be no interruption or change for you—I will continue to call on you on the same schedule you have come to trust.

## CONCLUSIONS OF LAW

In defense of its withholding of admittedly earned commissions, Burton Enterprises relied on the doctrine which holds that a faithless servant is not entitled to his compensation because of wrongdoing perpetrated on his employer. Wheeler argues that he was faithful to Burton Enterprises until the day he quit, and that merely contemplating going into competition with one's employer does not constitute faithlessness. Wheeler also argues that the faithless servant doctrine requires double dealing—profitting as a result of a breach of trust of the employer.

Both parties rely on *Bessman v. Bessman*, 214 Kan. 510, 520 P.2d 1210 (1974), in which the Kansas Supreme Court gave an exhaustive study on the faithless servant doctrine in Kansas. The facts in *Bessman* are dissimilar to those in the present case, in light of the manner in which employee Bessman secretly dealt in his principal's affairs for his own profit (*e.g.*, embezzlement). But the law set out in *Bessman* is helpful. The court began with the earliest statement of the faithless servant doctrine:

An agent's right to commissions is not absolute. It depends on the manner of performing his duties. It probably would not be forfeited by a simple lack of energy. But it might be by an improper retention of his principal's funds, or by acts of unfaithfulness to his trust.

*Id.* at 519–20, 520 P.2d at 1217–18 (quoting *Sumner v. Reicheniker*, 9 Kan. 320, 323 (1872)). The *Bessman* court also stated:

[A] principle has been consistently followed in this state. "The relation existing between a principal and agent is a fiduciary one demanding conditions of trust and confidence which require of the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of his beneficiary."

*Id.* at 520–21, 520 P.2d at 1218 (quoting *Merchant v. Foreman,* 182 Kan. 550, 322 P.2d 740 (1958)). The *Bessman* court had before it an agent who realized a secret profit through dealings on behalf of his principal. As has been noted, Wheeler did not realize any *direct* secret profits through dealings on behalf of Burton Enterprises.

The parties also cite *Henderson v. Hassur,* 225 Kan. 678, 594 P.2d 650 (1979), as supporting their side. In *Henderson,* an agent secretly appropriated $32,000 from his principal by locating and obtaining certain property at a cost of $56,000 and then immediately selling it to the principal for $88,000. The court used law applicable to a case in which an agent secretly appropriates money from his principal. Although this court does not dispute the validity of this law, the present case does not involve that situation. The law stated in *Henderson* is thus not relevant to Wheeler's conduct.

Based on this court's research, it appears that virtually every Kansas case invoking the faithless servant doctrine dealt with the agent's dishonestly diverting financial gain that should have gone to the principal. As discussed above, the original Kansas decision dealing with the doctrine, the *Sumner* case from 1872, spoke of this conduct as the "improper retention of [the] principal's funds." However, the *Sumner* case also spoke of a broader category of misconduct, *i.e.,* acts of unfaithfulness to the principal's trust. This court finds that the faithless servant doctrine is not limited to the former, but encompasses a variety of unfaithful conduct. Kansas courts would certainly extend the doctrine beyond the blatant misappropriation of funds if the proper set of facts were presented.

■ The Kansas policy concerning the duty of an agent such as Wheeler states that the relation is a fiduciary one, requiring the same obligation of individual service and loyalty of the agent as is imposed on a trustee. *See Bessman,* 214 Kan. at 520–21, 520 P.2d at 1218. Pursuant to this high standard, this court has researched the law in other jurisdictions and has found several analogous cases reflecting the policy of Kansas law. In *DSG Corp. v. Anderson,* 754 F.2d 678 (6th Cir.1985), in an opinion authored by Judge Celebrezze, an employer brought an action against former employees, alleging that they had breached their fiduciary duty to the employer by competing with it on a bid for a food services contract. At the time of the bidding, the defendants were still employed by the employer, but they had secretly set up their own corporation. The district court had instructed the jury that the acts of the employees were permissible as long as their employment was terminated before the contract was actually awarded.

The court found that under Kentucky law, "an employee-fiduciary may be liable to the employer for any gain derived by establishing a competing interest without full disclosure to the employer, *even if the employer has suffered no loss." Id.* at 682 (emphasis added). The court held that the district court erred in not informing the jury that the duty of loyalty and faithfulness includes the obligation (1) not to act against the employer's interests; (2) not to establish a competing enterprise until after the employment relationship is terminated; and (3) to disclose to the employer any information which could damage the company. *Id.*

The court in *Westwood Chemical Co. v. Kulick,* 570 F.Supp. 1032 (S.D.N.Y.1983), dealt with facts amazingly similar to the present case. In *Kulick,* the employer was engaged in the business of selling and distributing chemical products. The employer had a contract making it the exclusive sales representative of products manufactured by Synthetic. The employer had two sales persons named Fletcher and Kulick. These men became dissatisfied with the employer and while still employed, secretly formed a competing company and arranged a contract to be the new exclusive sales representative for Synthetic. The employer discovered this activity and fired the salespersons. The employer withheld earned commissions from the men on the basis of the

alleged breach of fiduciary duty. The two men counterclaimed for their commissions. The court held that under New York law,

> as long as the employment relationship continues, an employee is prohibited from conspiring to take away his employer's customers or to establish a competing business.... This is so because such a conspiracy would constitute a breach of the duties of the utmost good faith and loyalty that an employee owes to his employer.

*Id.* at 1036 (citations omitted).

This court believes that the law set out above is entirely consistent with the high standards that Kansas places on its fiduciaries. The court does not hesitate in believing that if the Kansas Supreme Court had the present issue before it, the court would approve of these principles. Therefore, this court will analyze the present case in light of these standards.

### OPINION OF THE COURT

Kent Wheeler was in a fiduciary capacity with Burton Enterprises. His outstanding performance for Livingston Industries, Ltd. and his agreement to continue his sales position for Burton Enterprises was the principle motivational factor behind Wasser's purchase of the defunct company. To say that the success of Burton Enterprises relied in large part on Wheeler's continued high performance is putting it mildly. Although Wheeler made no binding promises concerning the length of time during which he was to remain with Burton Enterprises, during his employment with the company he owed it the obligation of individual service and loyalty consistent with the fiduciary relationship. *See Bessman,* 214 Kan. at 520–21, 520 P.2d at 1218.

■ Kent Wheeler failed to meet the standard of conduct that Kansas law imposes on agents. The evidence indicates that as early as September 1983, Wheeler decided to pursue setting up his own company in competition with Livingston Industries, Ltd. (and its successor, Burton Enterprises). This alone cannot constitute a violation of the faithless servant doctrine.

However, Wheeler's conduct went far beyond merely entertaining thoughts of forming a new chemical detergent company. Even while bargaining with Wasser and agreeing on the $12,000 incentive payment as a condition of his employment with Burton Enterprises, Wheeler knew that a new company consisting of himself, Larry Carden, and Doug Livingston as owners was in the making. Yet at no time did Wheeler ever disclose to Wasser the possibility that should such a company come to fruition, he would be leaving Burton Enterprises.

Wheeler alleged that he was merely making a financial investment by helping set up Formula One, and that he never firmly decided to join the company until the day he left Burton Enterprises. However, the substantial planning activity belies these assertions. The evidence concerning the business cards is one indication that Wheeler knew well in advance that he would join the company. Furthermore, it appears from the testimony of Joe Collins that he and Wheeler timed their termination with Burton Enterprises to coincide with the earliest date upon which Formula One would be ready to market its products. Finally, Wheeler's numerous meetings with Carden and Livingston strongly indicate an intent inconsistent with Wheeler's assertions.

If Wheeler had *only an intent* to join the Formula One company upon its formation, and had he not acted on that intent in any manner except to leave Burton Enterprises at the appropriate time, this case might have a different result. However, it is the substantial planning activity and overt acts of Wheeler in furtherance of the conspiracy to establish a competing business that defeat his claim. First, he lured another Burton Enterprises salesperson, Joe Collins, into the new company. Stripping a manufacturer of its sales people is hardly conduct consistent with a duty of loyalty and service. Second, he participated in the purchase of the new company's building. Through this act he materially and financially aided the success of a company that would be in direct competi-

tion with his present employer. Third, although the evidence showed that Wheeler continued to avidly market Burton Enterprise products until the day he resigned, even this conduct was in furtherance of the conspiracy to set up a competing company. Wheeler obviously wanted to earn as much money as possible during his remaining days with Burton Enterprises, as any rational person would. But even more telling was his desire to maintain good contacts with the customers of Burton Enterprises. The evidence showed that Wheeler continued to call on these customers on behalf of Formula One, in which case his stable relationship with them furthered the success of the new company. In a letter to the customers, Wheeler deceptively indicated that a mere structural change in the company had occurred and that his service to them would be unaffected. Although this letter cannot be the basis for a violation of the faithless servant doctrine since it was mailed after Wheeler's termination with Burton Enterprises, it does demonstrate that his "faithful" service to the customers and his continued high sales performance on behalf of Burton Enterprises had an ulterior motive inconsistent with his fiduciary duty to the company. The evidence shows that his apparently loyal salesmanship in reality furthered the conspiracy to make the Formula One company as competitive as possible.

Perhaps the most egregious violation of his duty, however, was the lack of candor that Wheeler exhibited. Until the day he resigned, Wheeler never informed Wasser that he was displeased with his job at Burton Enterprises or that he was in the process of setting up his own company. Of course, had he done that, he most likely would have been fired immediately. Nevertheless, the *Anderson* court, in a case involving similar facts, stated that a fiduciary is obligated to disclose to his employer any information that could damage the corporation, including the setting up of a competing company. This would also certainly include the imminent loss of two salespersons whose combined performance accounts for well over 65% of the compa-

ny's sales. Finally, on the day Wheeler actually resigned from Burton Enterprises, Wasser was not even in the office. Wheeler gave no advance notice of his resignation, nor did he offer to continue as a salesman for a reasonable time while a replacement could be found. He simply wrote out a short note that he was quitting and slipped out the back door. For all of the reasons listed above, this court accordingly holds that Wheeler breached his duty of service and loyalty under Kansas law.

The remedy in Kansas for breach of the fiduciary duty in a case such as the present one is forfeiture of the agreed-upon compensation for the period of the agent's faithlessness. *See Bessman,* 214 Kan. at 522–23, 520 P.2d at 1219–20. In fact, it is interesting to note that the *Bessman* court adopted the approach of several sister states (New York and Minnesota) in establishing the remedy under the faithless servant doctrine. Since this court finds that Wheeler's faithlessness permeated his employment relationship with Burton Enterprises, Wheeler's entire claim of $12,069.47 will be denied, and judgment will be entered in favor of counterclaim defendant Burton Enterprises, Inc., d/b/a Livingston.

IT IS SO ORDERED.