FRYETECH, INC., Plaintiff,

v.

Greg L. HARRIS, Independent Specialty Coatings, L.L.C., Tom Tongier, Francis Edward Hastings, and Dale E. Wise, Defendants.

No. 98–1092–JTM.

United States District Court, D. Kansas.

March 23, 1999.

Roger M. Theis, John T. Moore, Hinkle, Eberhart & Elkouri, L.L.C., Wichita, KS, for Plaintiff.

Douglas G. Ott, Hall, Levy, Devore, Bell, Ott & Kritz, Coffeyville, KS, for defendants Greg L. Harris, Independent Specialty Coatings, Francis Edward Hatings, Dale E. Wise.

Jeffry L. Jack, Dearth, Markham & Jack, Chartered, Parsons, KS, for Defendant Tom Toniger.

*MEMORANDUM AND ORDER*

MARTEN, District Judge.

The present case involves claims by plaintiff FryeTech, Inc. ("FryeTech"), a manufacturer of carbon paper, against former FryeTech employees and their company, Independent Specialty Coatings, L.L.C. ("ISC"). FryeTech alleges the defendants breached various duties while still FryeTech employees and wrongfully acquired FryeTech property. FryeTech has moved for summary judgment on its replevin claim. The defendants have also moved for summary judgment. For the reasons stated herein, the former motion is granted and the latter motion is denied.

### I. *Summary Judgment Standard.*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue*

*for trial.'"* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. *The Facts.*[1]

### A. *The Defendants.*

Defendant Greg L. Harris began working in the carbon paper manufacturing industry after graduating from high school. He initially was an employee of Southwest Carbon Paper Manufacturing Company ("Southwest"), later becoming a 49% owner in that business. Southwest moved its operations to Parsons, Kansas in approximately November of 1972. In 1983, Southwest was purchased by Technicarbon, which merged with Frye Copy Systems on December 31, 1996, becoming FryeTech. At the time of the merger, Harris was General Manager of Technicarbon.

There is evidence Harris remained in this position until he resigned from FryeTech on April 30, 1997. Harris claims he did not know his job title during the four months he worked for FryeTech, and that he was stripped of his general manager responsibilities at some unspecified point during that 120-day period. It is uncontroverted that, as General Manager of both Technicarbon and FryeTech, Harris was familiar with all aspects of the carbon paper manufacturing business, including the ink formulations used in making products for plaintiff's customers, the contact people for plaintiff's customers, plaintiff's customer list and all of plaintiff's pricing information for these customers. Harris and his wife, Sue Ann Harris, formed the defendant ISC.

Defendant Edward Francis (Ed) Hastings worked during high school at IMI Business Forms, one of plaintiff's former large customers. After graduation from high school in 1979, he went to work for Southwest, and thereafter worked for Technicarbon and FryeTech. Defendant Hastings resigned his employment with FryeTech on May 30, 1997, without notice, and commenced working for the defendant ISC on June 2, 1997. He is presently employed as ISC's plant manager.

Defendant Dale Wise has an electronics degree from Pittsburg State College. He commenced working for Southwest in Parsons in 1975. In 1976 or 1977, he began working in a maintenance position which continued after Technicarbon purchased Southwest. He continued working as the head of the maintenance department for Technicarbon and for FryeTech until his resignation on May 30, 1997, again without notice, the same day that defendant Hastings resigned.

Defendant Tom Tongier has a Bachelor's Degree in chemistry from the University of Kansas. Tongier has known Harris since 1980, when he began working for Southwest. He continued working for Southwest, Technicarbon, and, finally, FryeTech until March 13, 1997, when FryeTech terminated his employment.

Most of the events pertinent to this action took place in a period commencing in March of 1997 and ending four months later. These events also divide into two

---

1. The material facts as set forth in this Memorandum and Order are either uncontroverted or, where disputed, viewed in the light most favorable to the non-moving party. *See* *McKenzie,* 854 F.2d at 367.

distinct but interrelated trails, the first being FryeTech's ongoing business, the other ISC's formation and development.

### B. *The Inception of ISC.*

The December 1996 Technicarbon/Frye Copy Systems merger is an appropriate starting point. Defendant Harris opposed the merger. He had competed with Frye-Tech for 25 years, and FryeTech treated and managed its employees in a fashion different from what he was accustomed to with Technicarbon. FryeTech had a reputation as being a centralized corporation with its decision-making and financial functions taking place at its home office in Des Moines, Iowa.

On March 15, 1997, two days after Tongier's termination from FryeTech, and approximately six weeks before Harris' own resignation, Harris and Tongier went to Topeka, Kansas and met with Craig Snyder of Adams Business Forms ("Adams"). Harris, Tongier and Snyder discussed Adams leasing some carbon paper manufacturing equipment to a new carbon paper manufacturing company Harris and Tongier were planning to form to compete with FryeTech. Although Harris states he had not actually formed an intent to compete with FryeTech at the time of the Topeka trip, it is uncontroverted that this was discussed with Adams. These discussions commencing on March 15, 1997 resulted in a business relationship with Adams which is discussed in more detail below.

In this same time period, but prior to April 30, 1997, Harris, his wife, Hastings, Wise and Tongier met at Harris's home, where they talked about leaving FryeTech and joining Harris in a new carbon paper manufacturing business. They also discussed how they could acquire FryeTech's excess machinery and equipment for reuse in this new business. Tongier has stated that, although he was at the meet-

ing, he did not hear conversations about obtaining equipment from FryeTech.

In another pre-April 30, 1997 development, Harris approached Charles W. Brown, the part-time Economic Development Director for the City of Parsons, and applied for financial incentives to start up a new carbon paper manufacturing facility which would compete directly with plaintiff. In addition, at some point—the actual time is not clear—Brown was provided with a copy of a business plan ("Business Plan") prepared by Greg Harris.[2] Brown was aware that Harris was still employed at FryeTech's Parsons plant at the time Harris applied for incentives for the new business venture. At that same time, Harris also told Brown there was a good possibility that FryeTech would be closing its local manufacturing facility. No one from the city ever contacted any official Frye-Tech representative concerning any of these matters. During this time, Harris and the City of Parsons were in continuous communication with respect to the type of financial assistance package Harris's new company needed and what the city could provide.

The Business Plan Harris prepared specifically identifies ISC's "management team" as defendants Harris, Hastings, Tongier and Wise. The Plan also specifically mentions Harris leaving FryeTech and references FryeTech's machinery and equipment: "I have decided to leave the employment of FryeTech, and once again try to start an independent competitive carbon coating operation. There is old equipment available which will require substantial investment to bring it to competitive levels." Harris also wrote the "majority of this money will go towards materials to build ink tanks *and to repair and modify equipment* to bring it up to competitive standards." (Plf.Dep.Exh. 43, at 1, and 4) (Emphasis added.) The lan-

2. The Business Plan was formally presented to the Parsons City Council on or about May 2, 1997, while defendants Hastings and Wise were still employed by FryeTech, and two

days following Harris's resignation. Harris's Business Plan makes a number of derogatory and untrue comments about FryeTech.

guage of the plan clearly indicates it was drafted while Harris and all members of ISC's "management team" other than Tongier were still employed by FryeTech.

At some point in this same March through April 1997 time period, Harris and Brown began looking in Parsons for building or warehouse sites for Harris's new carbon paper manufacturing operation. Ultimately, the ISC manufacturing facility was secured on or before May 19, 1997, from the City of Parsons.

### C. *Defendants' Acquisition of the Machinery, Equipment and Parts.*

The machinery used to place ISC in operation has a story of its own. In March and April, 1997 FryeTech instructed Harris and Hastings to scrap certain machinery, equipment and parts that were being stored in plaintiff's warehouse and were not in use. Gene Carlson, FryeTech's vice president at the time, not only wanted the equipment scrapped, he told Harris he wanted to see pictures of the scrapped equipment so he could ascertain if the equipment was in bad enough condition to be junked. This equipment included large carbon paper manufacturing machinery identified as a spot coater, a rod coater, a 45" slitter, a print coater, and a 60" slitter.

Richard "Rick" Trotnic ("Trotnic") grew up in the salvage business. His father owned and operated Trotnic Salvage ("Trotnic Salvage") located in Parsons, Kansas until he retired in 1983. His brother, Patrick, took over the salvage business at that time. In April 1997, Hastings called Trotnic and asked him to come out to FryeTech's plant. Hastings told Trotnic that FryeTech had some scrap equipment, and asked if Trotnic would take a look at the equipment and give them a price on it. Prior to that time, Trotnic had done business with FryeTech and its predecessor, Technicarbon. Trotnic first went to FryeTech's main manufacturing building and then to FryeTech's storage warehouse to look at the equip-

ment. He was accompanied by Wise and, perhaps, Hastings.

Trotnic later asked whether or not FryeTech wanted Trotnic Salvage to pick up and scrap the equipment. Hastings told Trotnic he (Hastings) wanted to arrange the purchase of FryeTech's equipment from Trotnic. Hastings told Trotnic he (Hastings) would keep the equipment and Trotnic would not have to haul it to his salvage yard. At that time, the equipment had already been dismantled and most of it was sitting on palettes or on the floor of plaintiff's warehouse.

Trotnic was never hired to scrap the equipment and denies ever buying plaintiff's equipment although he made an arrangement with Hastings whereby Trotnic would weigh FryeTech's equipment and pay FryeTech a penny a pound for it. Trotnic always paid FryeTech by check. Hastings always immediately reimbursed Trotnic in cash. In April 1997, when this transaction was negotiated, Trotnic never had any direct communication with Harris. All of his communications were with Hastings or Wise.

This equipment was never transferred to Trotnic's salvage yard and scrapped. Trotnic knew the FryeTech equipment, machinery and spare parts which had been designated to be scrapped were to be taken from the FryeTech warehouse and weighed at the Trotnic Salvage facility, but he did not know where defendants were going to store the property. In fact, the equipment was stored at the IMI Business Forms ("IMI") warehouse in Parsons. At Harris's request, Walter Veenis, the Vice President of production at IMI, agreed to let defendants store the equipment, machinery and spare parts in IMI's warehouse in April 1997. Wise had cut the frames of the FryeTech equipment at the place allowing the equipment to be moved most easily, knowing it would be moved to the IMI warehouse. Tongier knew this equipment had been stored at the IMI warehouse. Harris also knew this machin-

ery and equipment was being stored at the IMI warehouse until it could be moved into ISC's new manufacturing facility. Incidentally, IMI also was a FryeTech customer.

On May 10, 1997, Hastings prepared a memo to Russ Dohrmann and Gene Carlson, the President and Vice President of FryeTech, respectively. The memo advised falsely that the spot coater had been scrapped. The defendants also sent to FryeTech Polaroid photographs (reproduced in Dep.Exh. 18) to make plaintiff believe the equipment was scrap and unusable. Wise, the person who allegedly scrapped the equipment, took the Polaroid pictures shown in Dep.Exh. 18, and Greg Harris printed the descriptions at the bottom of each picture and sent them to the plaintiff. Hastings instructed Wise to take the pictures because Dohrmann or Carlson wanted pictures taken to determine whether the machinery should be junked.

The defendants added some further equipment to the spot coater, rod coater, the two slitters and the print coater. At some point prior to May 30, 1997, Wise bought two metal lathes from FryeTech after negotiating the purchase price with Hastings. A FryeTech chiller tank was also to have been scrapped, but was obtained and repaired by Wise. All of this equipment was obtained to allow ISC to begin operations.

#### D. *Defendants' Continuing Relationship with FryeTech.*

On April 30, 1997, Harris resigned from FryeTech without notice. All defendants save Tongier were still FryeTech employees. While employed at FryeTech and its predecessor, Tongier developed general ink formulations for Adams, one of FryeTech's largest customers. This process began while Tongier was an employee of Technicarbon. He never obtained any personal patents or copyrights on those ink formulations. (Tongier Dep. p. 30)

The plaintiff alleges Tongier kept a list of ink formulations that each of the cus-

tomers used while he was employed at Technicarbon and/or FryeTech, and he took that list with him when he was terminated from FryeTech, along with general information he had about making those formulations for plaintiff's customers. Tongier states he did not take any list of formulas from FryeTech and has not used any of the formulas used by Technicarbon or FryeTech on ISC's behalf. He acknowledges that when he left FryeTech, he did take a computer disk with some simple spreadsheets on it, including one which would calculate the expense of ink based on the raw materials used.

Two days after his termination, as noted above, Tongier and Harris met with an Adams representative in Topeka. Subsequently, Tongier became what he and Harris contend is a "consultant" for ISC. However, an ISC brochure represents Tongier to be one of the key "personnel" on its "management and production teams." During this period of time, Tongier and Dohrmann were corresponding with one another about a covenant not to compete offer from FryeTech to Tongier.

In the two months leading up to Harris's resignation, while traveling to Topeka with Tongier to meet with Adams, meeting at his home with other FryeTech employees about commencing a new business, and while meeting with City of Parson's representatives about starting up a new carbon paper business, Harris received a $45,000 bonus from FryeTech. Additionally, FryeTech sent Harris and Hastings to a FryeTech management meeting in Dallas, Texas, which lasted approximately four days. During the course of that meeting, Harris and Hastings were furnished with copies of plaintiff's supplier lists, supplier costs, and pricing information for FryeTech's customers and products.

Following Harris's resignation on April 30, 1997, Hastings was promoted by FryeTech to the position of General Manager. He also received a substantial pay increase from FryeTech in the approximate amount

of $10,000 per year. Hastings never advised Dohrmann or anyone at FryeTech of his plans with Harris or that FryeTech's machinery, equipment and spare parts were being stored at IMI's warehouse.

On May 30, 1997, Harris called Hastings, offering Hastings a job with ISC. Hastings terminated his position with FryeTech at 5:00 p.m. that same day. Before leaving FryeTech, Hastings made copies of FryeTech's check and the receipt to Dale Wise for the lathes, copies of the receipts with respect to the former Frye-Tech equipment, including the spot coater that Hastings allegedly scrapped, and copies of the checks and receipts from Trotnic Salvage for the alleged scrapped material. Wise also terminated his employment with FryeTech on May 30, 1997, and began working for ISC three weeks later.

During March 1997 through his resignation April 30, 1997 time period, Harris never advised Dohrmann, Carlson, or any other FryeTech representative of his: (1) plan to start a competing business; (2) negotiation with Adams, which resulted not only in the leasing of equipment from Adams, but also making Adams a major customer of ISC; (3) plan with the other defendants to contravene orders to scrap FryeTech machinery, acquiring it instead in order to equip ISC; and (4) plans to leave the company after receiving a $45,000 bonus, and attending a four-day management meeting at which FryeTech's customer and product information were provided. Hastings and Wise were employees while all of these activities were going on, as well as during May 1997, when Hastings received a promotion and an approximately $10,000 a year raise. Harris, Hastings and Wise worked together in providing false information to Dohrmann and/or Carlson regarding the scrapping of equipment, and engaged in other activities which clearly were not in FryeTech's interests.

### E. *The ISC Operation and the Defendants' Activities.*

ICS moved into its facility to set up operations around June 1997. Hastings, together with Wise and two other former FryeTech employees, Dan Reed and Terry Shouse, helped move all of the "scrapped" FryeTech equipment, machinery and spare parts from the IMI warehouse into the defendants' new ISC facility. All of the plaintiff's equipment which Hastings was ordered to scrap while he was employed at FryeTech, including two slitters, a print coater, a rod or blade coater, other miscellaneous scrap pieces and a spot coater that defendants had obtained from FryeTech in April and May of 1997, is presently in use in ISC's manufacturing facility. Hastings never instructed Wise to junk or scrap FryeTech's equipment so it would be rendered unusable and Wise never cut up plaintiff's machinery so it could not be used. Wise also used plaintiff's spare parts to make a blade coater that is presently in use at ISC. The two metal lathes Wise bought from FryeTech prior to his termination on May 30, 1997 were also moved into ISC's new facility and are presently in use by Wise. In addition, a sheeting drum built by Dale Wise while still employed at FryeTech is also now in use in the defendants' manufacturing facility. In fact, this equipment, with the exception of the sheeting drum, is identified on the defendants' 1998 depreciation schedule for its machinery and equipment. The equipment has a total value in excess of $135,000. A collection of color photographs taken by Hastings depicts this equipment as it was being set up around June of 1997 in the defendants' new facility. Dale Wise repaired the chiller tank that is depicted on p. 10 of these photos.

Adams leases to ISC two pieces of carbon paper making equipment at a rate of $50 per month. Ultimately, ISC also entered into a two-year contract for the supply of certain carbon paper products to Adams immediately after the two-year contract between FryeTech and Adams expired in September 1997.

Deposition Exhibits 15, 19, 20, 21, 27, 28, 32, 33 and 34 are receipts which were

maintained and produced by Harris in connection with this litigation, even though some of the receipts, for example Deposition Exhibit 20, originated after Harris had terminated his position as General Manager of FryeTech. In fact, Hastings, who was still employed at FryeTech, kept copies of these receipts and provided them to Harris after he resigned from Frye-Tech. Hastings testified he kept those receipts so that there was proof the equipment belonging to FryeTech had purportedly been sold and FryeTech had received checks for this equipment, machinery and parts. Hastings obtained the receipt depicted in Deposition Exhibit 20 from Trotnic Salvage shortly after he had been promoted and received the raise. The receipt was for a spot coater that Gene Carlson, FryeTech's Vice President, directed Hastings to have scrapped. Hastings kept the Trotnic Salvage receipts and copies of checks made payable for the alleged scrap material because he "didn't and still don't (sic) trust Russ Dohrmann or Gene Carlson either one and so I wanted to show that I did what I was told to do." (Hastings dep. at 80.)

In December 1977, FryeTech closed its Parsons, Kansas plant. All of ISC's employees are former employees of Frye-Tech, except Harris's wife. The top five customers of ISC—Ace Forms, Adams Business Forms, IMI Business Forms, National Checking Company, and WIT Printing Company—were all customers or former customers of FryeTech or Technicarbon prior to April 30, 1997, when Harris resigned from FryeTech. ISC also serves other former FryeTech/Technicarbon customers.

As of the briefing of these motions, Harris, Hastings and Wise were ISC employees, with Harris and his wife owners of ISC. As noted previously, ISC also employs exclusively other former FryeTech employees. Tongier claims to be a "consultant" for ISC, receiving a monthly fee of $500 for preparing ISC's ink formulations for FryeTech's former customers.

Tongier used the information he gained over the years as a chemist for FryeTech and Technicarbon to develop these formulas. As part of his package, Harris promised Tongier a 5% ownership interest in ISC once the company paid off its $300,000 SBA loan as well as the opportunity to purchase another 5% interest for an amount to be determined, based on the net worth of the company. Defendants Hastings and Wise have been given the same opportunity to own up to 10% of ISC.

## III. *Conclusions of Law*

The court finds the uncontroverted facts require the denial of the defendants' motion to dismiss the various tort claims against them, and further demonstrate FryeTech's right to replevin of its former equipment.

### A. *The Employee's Duty to the Employer.*

The uncontroverted evidence establishes that the equipment is specific personal property, that FryeTech is legally entitled to possession of the equipment, and that the equipment was unlawfully detained by the defendants. *See Kansas Gas & Electric v. Eye*, 246 Kan. 419, 430, 789 P.2d 1161 (1990). Between the parties herein, FryeTech is the lawful owner of the equipment, the defendants having acquired it through the violation of their lawful duties.

> It is well settled that "the relation existing between a principal and agent is a fiduciary one demanding conditions of trust and confidence. [I]n all transactions concerning and affecting the subject matter of his agency, it is the duty of the agent to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. The agent must give the principal the benefit of all his knowledge and skill and cannot withhold or conceal information from the principal."

*Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 683–84, 829 P.2d 884 (1992) (quoting *George v. Bolen*, 2 Kan.

App.2d 385, 387, 580 P.2d 1357 (1978) (quoting *Sanders v. Park Towne, Ltd.,* 2 Kan.App.2d 313, 317, 578 P.2d 1131, *rev. denied* 225 Kan. 845 (1978))) (elipses and internal quotations omitted).

■ Under Kansas law, agents such as the defendants have a duty to act solely for the benefit of the employer in all matters within the scope of the employees' employment, and to avoid conflicts between their duty to the employer and their own self-interest. In *Gillespie v. Martin, Pringle,* 258 Kan. 91, 93, 899 P.2d 478 (1995), the court expressly stated:

"An agency relationship is a fiduciary one." *Kline v. Orebaugh,* 214 Kan. 207, 210 [519 P.2d 691] (1974). In transactions affecting the subject matter of the agency, it is the duty of the agent to act in good faith and with loyalty to further advance the interests of the principal. *Henderson v. Hassur,* 225 Kan. 678, 687 [594 P.2d 650] (1979).

■ Here, by procuring their employer's equipment through surreptitious means, the defendants violated this duty of good faith and loyalty. The defendants make no credible argument that, as officers of FryeTech, they would have owed the company no duty of loyalty or good faith. In their response to FryeTech's motion for summary judgment, the defendants do contend, however, that Harris, at the time he left the company's employment, had been removed from his status as General Manager of the Parsons facility, and, accordingly was a mere employee of the corporation and thus owed no duty of loyalty or good faith.

The defendants' argument fails at two levels. First, there is no evidence for the alleged "demotion" other than the conclusory assertion in Harris's affidavit that he had been relieved of managerial responsibilities. Even assuming Harris had been restricted in his actual responsibilities, there is no evidence that he actually had been removed from the position of General Manager. The duty of loyalty discussed in the cases interpreting Kansas law does not

turn on the amount of managerial authority the agent has.

More importantly, even if it were true that Harris had been officially removed and was a "mere employee," the defendants err in suggesting this relieved him of any duty of good faith or loyalty toward the corporation. While most of the cases which have addressed the fiduciary responsibilities of agents under Kansas law have involved corporate directors or officers, there is no basis for concluding these are the only types of agents subject to fiduciary duties. Significantly, defendants cite no authority for their suggestion that agents owe no duty of loyalty to their employer. To the contrary, the cases speak of the duties of agents without respect to their exact status. In *Bessman v. Bessman,* 214 Kan. 510, 519, 520 P.2d 1210 (1974), the court recognized the "universal application of the rule" restricting the right of a dishonest agent to compensation. The court also acknowledged with approval the statement:

An agent *or employee* of another is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. Not only must he account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal.

*Id.* (quoting *Hey v. Cummer,* 89 Ohio App. 104, 97 N.E.2d 702 (1950) (quoting *Lamdin v. Broadway Surface Adv. Corp.,* 272 N.Y. 133, 5 N.E.2d 66, Syl ¶ 1 (1936)) (emphasis added).

Similarly, in *Burton Enterprises v. Wheeler,* 643 F.Supp. 588 (D.Kan.1986), Judge Saffels found a violation of fiduciary duties by the defendant agent when he engaged in acts of competition against his principal during the agency. The defendant in *Burton Enterprises* was neither a director nor an officer, but a salesman

employed by the plaintiff. The court stated:

> Kent Wheeler was in a fiduciary capacity with Burton Enterprises. His outstanding performance for Livingston Industries, Ltd. and his agreement to continue his sales position for Burton Enterprises was the principle (sic) motivational factor behind Wasser's purchase of the defunct company. To say that the success of Burton Enterprises relied in large part on Wheeler's continued high performance is putting it mildly. Although Wheeler made no binding promises concerning the length of time during which he was to remain with Burton Enterprises, during his employment with the company he owed it the obligation of individual service and loyalty consistent with the fiduciary relationship.

643 F.Supp. at 592.

In *Shell Petroleum v. Pratt*, 22 F.Supp. 304 (D.Kan.), *aff'd*, 100 F.2d 833 (10th Cir.1938), *cert. denied*, 306 U.S. 659, 59 S.Ct. 775, 83 L.Ed. 1056 (1939), an employer oil company brought suit against a former employee geologist, seeking to impose a constructive trust in its favor on oil leases acquired by the geologist during his employment. There was no suggestion in the case that the defendant was an officer or director of the plaintiff. Nonetheless, the district court found the defendant geologist "occupied a position highly fiduciary in character, and he owed Shell the duty of absolute loyalty." 22 F.Supp. at 306. The Tenth Circuit affirmed, stating:

> It must be held upon plain principles of reason and sound public policy that an agent occupying a place of trust and confidence is not permitted to put himself in a position in which his personal interests may come in conflict with his duty to his principal. He cannot assume a position which may afford the temptation to subordinate the interests of his principal to those of himself in the discharge of his duty. In order to be free from temptation he is disabled from placing himself in such a position.

100 F.2d at 835–36.[3]

The defendants' argument that "mere employees" owe no duty of loyalty or good faith to their employer is without merit.

The defendants also present a series of arguments, that, even if such duties were owed, they were not violated under the facts of the present case. The defendants argue the equipment sold was unwired, junk equipment that had not been used for years. They contend they had to spend $138,295.86 to get the equipment operational, and that, once the equipment was sold for scrap, it was no longer FryeTech's equipment.

The defendants' arguments fail under the facts of the case and in light of Kansas law. The defendants do not provide any evidence that the equipment had "no value" at the time it was sold to Trotnic. The only support which they even attempt to provide in this respect is the contention that "Trotnic Salvage paid a penny a pound for the junk equipment and Richard Trotnic believes that that was a fair price." (Plf. Resp. at 12, ¶ 59). There is absolutely no evidence that Trotnic has any experience in or knowledge of the printing industry. To the contrary, the evidence indicates that Mr. Trotnic is, in all respects, simply a local junk dealer with no particular qualification to speak to the value of printing technology from anything other than his own scrap metal perspective.

In contrast to the absence of evidence that the equipment in fact had zero value, there is unrebutted evidence by the plaintiff that the equipment did retain substan-

---

**3.** The defendants' position has not found support in other jurisdictions. Thus, in *Kieburtz & Assoc. v. Rehn*, 68 Wash.App. 260, 842 P.2d 985, 987, 988 (1992), the court, in reversing the decision of the trial court, explicitly rejected the contention of the defendants that they owed no duty to refrain from competing with their employer since they were "mere employees."

tial value at the time it was scrapped. Significantly, much of this evidence comes from the defendants themselves. For example, in applying for SBA financing for Independent Specialty Coatings, Harris explicitly represented the company's equipment (the former FryeTech equipment) was worth $15,000.

Moreover, even assuming the equipment had no market value, this does not mean the defendants, as former employees of the plaintiff, were free to acquire it without disclosing this to FryeTech. That is, even if the equipment did not have any direct value to an independent purchaser who might use it for some other purpose, FryeTech had a legitimate interest in preventing the equipment from being used against it by a competitor in the printing industry.

The defendants argue no duties were breached because the equipment was in fact sold for scrap, and that legal title passed to Trotnic, precluding FryeTech from obtaining relief herein. Thus, in their response, the defendants argue it "was not Hastings' understanding that the equipment was to be scrapped so it could not be used by anyone." (Resp. at 10, ¶ 54).

These arguments are not persuasive. The defendants were not only directed to "scrap" the equipment, in at least one instance (the spot coater) they were explicitly told to physically destroy the equipment prior to selling it for scrap. In doing so, the company was manifesting a clear and unmistakable intent that the equipment would never be used by a potential competitor of the company. The defendants have not offered any explanation for how they could have construed direct, explicit instructions by FryeTech to cut and burn holes in the equipment as anything other than an intent to render the equipment permanently non-functional.

Just as importantly, the duty of loyalty and good faith discussed earlier is not limited to a narrow, literal performance of duties explicitly imposed by the employer. The uncontroverted facts establish that the defendants intended to acquire the equipment for their new business, and that the arrangement with Trotnic was a sham with no purpose other than to make it appear the equipment had been dismantled and sold for scrap. The duty of good faith—simple honesty—required the defendants to inform their employer of their intentions.

### B. *Superior Possessory Interest in the Equipment.*

Nor does the fact that legal title technically may have passed through Trotnic defeat FryeTech's claim for replevin, any more than does the existence of outstanding bank lien interests in the equipment. As noted earlier, the plaintiff satisfies the elements of replevin by showing a superior possessory interest in the property in comparison to the defendants. That the defendants did not acquire some form of "clean" title to the equipment by means of their sham arrangements with Trotnic is established by comparing the facts of the present case with those in *Barnett v. Dunlop,* 121 Kan. 758, 250 P. 299 (1926), in which the court held that a real-estate agent, employed to sell a tract of land, could properly acquire an interest in the land from an intermediary purchaser. The court wrote:

It is elementary that, after a real estate agent has effected a sale of his principal's land to one who purchased for himself, the agent may purchase for himself from the vendee, providing the agent's mediate acquisition of his principal's property was free from subterfuge and was characterized throughout by good faith. In this instance, defendants executed the contract of sale to McCune [the intermediary], and prices and terms were indisputably acceptable to them. McCune made the necessary initial payment, and purchased in good faith on his own account. There was no evidence indicating that he was a nominal vendee, or mere conduit of title from defendants to plaintiff (*Smith v. Tyler,* 57 Mo.App.

668), or had any express or tacit understanding that plaintiff was to take his place in the purchase. There was no evidence that, when the land was sold to McCune, plaintiff had any thought, much less expectation, that he would become its owner.

121 Kan. at 759–60, 250 P. 299.

The contrast with the present case could not be more extreme. The equipment here was acquired by subterfuge. The putative purchaser, Trotnic, was immediately repaid in full in cash by the defendants (or their wives). The equipment was immediately passed from Trotnic's ownership to the new business. In the words of *Barnett*, Trotnic was a "mere conduit of title" for the defendants.

### C. *Good Faith and the Right to Compete.*

In their response to FryeTech's motion and in their own motion, the defendants stress the right of an employee to compete against a former employer. In this context, they rely particularly upon the Kansas Supreme Court's decision in *Parsons Mobile Products v. Remmert*, 216 Kan. 256, 531 P.2d 428 (1975). In that case the court wrote:

> It is generally recognized in the absence of an agreement not to compete that a director or officer on termination of his position with the company will not be precluded from entering into and engaging in a business enterprise independent from, though similar to, that conducted by the corporation itself, provided in doing so he acts in good faith and does not interfere with that business enjoyed by the corporation. (19 Am.Jur.2d, Corporations, § 1282, p. 690.) At the time a director or officer is removed or resigns from the corporation his position of trust with the corporation is terminated. It is generally held in such case that even before termination he is entitled to make arrangements to compete, except he cannot properly make use of confidential information peculiar to the corporation's business and acquired therefrom. Thus, he may purchase or initiate a rival business before the end of his relationship as an officer or director and upon termination of his employment immediately compete. (*United Aircraft Corp. v. Boreen*, 3 Cir., 413 F.2d 694; *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 162 A.2d 370.) This is a country of free enterprise based upon competition.

531 P.2d at 432–33.

■ *Parsons Mobile Products*, however, does not stand for an unrestricted right on the part of employees to compete, or to prepare to compete, against their employer. The court wrote that the "essential inquiry on any charge of unfair competition is good faith," and that good faith would ordinarily protect the former employee "unless it is shown the rival business was intentionally operated for the purpose and in such a way as to be unfair and detrimental to the former employer-corporation." *Id.* Good faith, as clearly expressed in other decisions in Kansas, incorporates a duty of disclosure to the employer of the prospective competition. In addition, the court in *Parsons Mobile Products* expressed particular reliance upon the trial court's findings that the competing former director "did not interfere with the remaining operations of plaintiff company by hiring plaintiffs' employees, using plaintiffs' property, or interfering in any other manner." *Id.*

■ In the present case, in contrast, the defendants cannot be said to have acted in good faith. They ignored explicit directions to destroy and scrap equipment, instead engaging in a sham arrangement to acquire the equipment themselves. They undertook efforts to acquire other facilities and financing for their business. In the context of these efforts they made disparaging comments about FryeTech's operations. And, significantly, at no time did they inform FryeTech of any of these actions or intentions.

The defendants' conduct is thus much more similar to that found to have been a violation of duty by Judge Saffels in *Burton Enterprises*. In discussing the defendant's conduct in that case, Judge Saffels wrote it exceeded the otherwise permissible right of an employee to compete:

However, Wheeler's conduct went far beyond merely entertaining thoughts of forming a new chemical detergent company. Even while bargaining with Wasser and agreeing on the $12,000 incentive payment as a condition of his employment with Burton Enterprises, Wheeler knew that a new company consisting of himself, Larry Carden, and Doug Livingston as owners was in the making. Yet at no time did Wheeler ever disclose to Wasser the possibility that should such a company come to fruition, he would be leaving Burton Enterprises.

Wheeler alleged that he was merely making a financial investment by helping set up Formula One, and that he never firmly decided to join the company until the day he left Burton Enterprises. However, the substantial planning activity belies these assertions. The evidence concerning the business cards is one indication that Wheeler knew well in advance that he would join the company. Furthermore, it appears from the testimony of Joe Collins that he and Wheeler timed their termination with Burton Enterprises to coincide with the earliest date upon which Formula One would be ready to market its products. Finally, Wheeler's numerous meetings with Carden and Livingston strongly indicate an intent inconsistent with Wheeler's assertions.

If Wheeler had only an intent to join the Formula One company upon its formation, and had he not acted on that intent in any manner except to leave Burton Enterprises at the appropriate time, this case might have a different result. However, it is the substantial planning activity and overt acts of Wheeler in furtherance of the conspiracy to establish a competing business that defeat his claim. First, he lured another Burton Enterprises salesperson, Joe Collins, into the new company. Stripping a manufacturer of its sales people is hardly conduct consistent with a duty of loyalty and service. Second, he participated in the purchase of the new company's building. Through this act he materially and financially aided the success of a company that would be in direct competition with his present employer. Third, although the evidence showed that Wheeler continued to avidly market Burton Enterprise products until the day he resigned, even this conduct was in furtherance of the conspiracy to set up a competing company. Wheeler obviously wanted to earn as much money as possible during his remaining days with Burton Enterprises, as any rational person would. But even more telling was his desire to maintain good contacts with the customers of Burton Enterprises. The evidence showed that Wheeler continued to call on these customers on behalf of Formula One, in which case his stable relationship with them furthered the success of the new company. In a letter to the customers, Wheeler deceptively indicated that a mere structural change in the company had occurred and that his service to them would be unaffected. Although this letter cannot be the basis for a violation of the faithless servant doctrine since it was mailed after Wheeler's termination with Burton Enterprises, it does demonstrate that his "faithful" service to the customers and his continued high sales performance on behalf of Burton Enterprises had an ulterior motive inconsistent with his fiduciary duty to the company. The evidence shows that his apparently loyal salesmanship in reality furthered the conspiracy to make the Formula One company as competitive as possible.

Perhaps the most egregious violation of his duty, however, was the lack of

candor that Wheeler exhibited. Until the day he resigned, Wheeler never informed Wasser that he was displeased with his job at Burton Enterprises or that he was in the process of setting up his own company. Of course, had he done that, he most likely would have been fired immediately. Nevertheless, the *Anderson* court, in a case involving similar facts, stated that a fiduciary is obligated to disclose to his employer any information that could damage the corporation, including the setting up of a competing company. This would also certainly include the imminent loss of two salespersons whose combined performance accounts for well over 65% of the company's sales. Finally, on the day Wheeler actually resigned from Burton Enterprises, Wasser was not even in the office. Wheeler gave no advance notice of his resignation, nor did he offer to continue as a salesman for a reasonable time while a replacement could be found. He simply wrote out a short note that he was quitting and slipped out the back door. For all of the reasons listed above, this court accordingly holds that Wheeler breached his duty of service and loyalty under Kansas law.

643 F.Supp. at 592–93.

### D. *The Increased Value of the Equipment.*

As this court has recently stressed, Kansas law requires an agent to scrupulously honor his duty to disclose self-interested transactions. *Arst v. Stifel,* 954 F.Supp. 1483 (D.Kan.1997) (involving undisclosed self-dealing by a stockbroker). If that duty is violated, the undisclosed transactions are voidable by the principal, even if they were otherwise for fair market value. Thus, the court finds the amounts expended by the defendants to improve the wrongfully obtained equipment are not a bar to replevin of the equipment, nor are the defendants entitled to compensation for those improvements. This is because of the "strong view of a fiduciary's duty of loyalty" taken by Kansas law. *Arst,* 954 F.Supp. at 1491. In *Arst,* the court found the strength of this duty was sufficient to require the defendant stockbroker not only to pay for the stock wrongfully purchased, but also to pay for any subsequent increases in value—to recover both the stock and any profits.

The Restatement of Restitution, § 158, comment d. states the general rule applicable here:

The conscious wrongdoer is ordinarily not allowed compensation for an improvement or addition to the subject matter. This is consistent with the rule of damages in actions for conversion in which case the conscious wrongdoer is required to pay for the full value of the chattel as improved by him before demand for its return. Ordinarily, it would be unjust to require the owner on regaining his property to pay for improvements which he might not have desired.

IT IS ACCORDINGLY ORDERED this 23rd day of March, 1999, that plaintiff's motion for partial summary judgment (Dkt. No. 47) is granted; defendants' motion for summary judgment (Dkt. No. 49) is hereby denied. In light of these determinations and the approaching trial, plaintiff's earlier motions for injunctive relief, replevin, and preservation of evidence (Dkt. No. 1, 3) are denied as moot.